STATE of Wisconsin, Plaintiff-Respondent,

v.

Richard M. FISCHER, Defendant-Appellant.†

Court of Appeals

*No. 2007AP1898–CR. Submitted on briefs May 16, 2008.*
*—Decided September 10, 2008.*

2008 WI App 152

(Also reported in 761 N.W.2d 7.)

† Petition to review granted.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Robin Shellow* and *Urszula Tempska* of *The Shellow Group* and *James M. Shellow*, of counsel, of *Shellow & Shellow, S.C.*

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Adam Y. Gerol*, assistant district attorney, Port Washington.

Before Brown, C.J., Anderson, P.J., and Snyder, J.

¶ 1. BROWN, C.J.[1]  WISCONSIN STAT. § 343.303 bars admitting the results of a Preliminary Breath Test (PBT) in drunk driving trials. Nonetheless, Richard M. Fischer sought to admit the testimony of his expert, who would tell the jury that he compared the blood test result with the PBT result and, by doing so, could extrapolate a probable blood alcohol concentration at the time Fischer was last seen operating his vehicle, about thirty minutes before the PBT was administered. Fischer claimed that he was constitutionally entitled to present this expert's analysis as an integral part of his defense. But the trial court, relying on the statute, refused to allow the expert to testify. The jury found Fischer guilty and he appeals, claiming that the trial court's reliance on the statute was arbitrary and disproportionate to the statute's purposes. We disagree. The legislature decided to prohibit admission of PBTs because they are not tested for accuracy at the time the

---

[1] This case was converted from a one-judge appeal to a three-judge appeal pursuant to WIS. STAT. RULE 809.41(3) (2005–06). All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

PBT is administered. Prohibiting their use in this OWI trial is in accord with the legislative intent. We affirm.

## BACKGROUND

¶ 2. The facts are brief and undisputed. At approximately 1:40 a.m. on January 29, 2005, Fischer was pulled over by a Village of Thiensville police officer on suspicion of driving while intoxicated. The officer asked Fischer to perform field sobriety tests, which Fischer failed, and then administered a PBT. The PBT, taken about a half hour after Fischer was stopped, showed a breath alcohol concentration of .112 percent. Fischer was then arrested for OWI and taken to a local hospital for an evidentiary chemical blood test. The blood was drawn at 2:48 a.m. and the test result showed a .147 percent BAC. The State charged Fischer with OWI and PAC, both as second offenses. Fischer pled not guilty to the charges and the matter was set for trial.

¶ 3. Fischer retained an expert witness, Dr. John Steele, who prepared a report regarding Fischer's BAC at the time he was driving. Dr. Steele relied on both the PBT and blood test data and opined that at approximately 1:40 a.m., when Fischer was first stopped, his BAC "may have been below 0.08%." The State filed a motion to exclude Dr. Steele's report and professional opinion because it relied, in part, on the PBT result, which is inadmissible in prosecutions for OWI under WIS. STAT. § 343.303. Fischer subsequently offered a revised report wherein Dr. Steele clarified that "the breath test was a contributory datum, but it is the interplay and dynamic relationships between the breath test and the blood test rather than either one alone which support my inferences." On August 24, 2006, the court held a hearing on the State's motion to exclude Dr. Steele's reports and testimony.

328

¶ 4. At the hearing, the State argued that Dr. Steele's testimony should not be allowed because the opinion was based in part on a PBT result that was not tested for accuracy. To illustrate its point, the State compared the Intoximeter with the PBT. We think it is important to cite the prosecutor's statement in pertinent part because it is important to the ultimate rationale of this opinion.[2]

> The Intoximeter, as the Court can I think take judicial notice of, has certain procedures that are involved in the testing procedure. There is a 20–minute waiting period to insure that there is no mouth alcohol or other things going on. There is a two-test procedure. The two breath samples from the subject have to be within a certain quantitative number. They have to be taken within a certain time frame. There are air blank tests within the testing procedure at different points. There is a control sample within that procedure that must meet a certain quantitative number or within a certain quantitative number in order for the test to be valid. And there is a certain amount of air that must be blown into that machine, usually testified to as you have to have the tone there before you have given enough air. And of course we have seen cases where there is a deficient sample, not enough air has been blown into it.

> The other side then is the PBT, which doesn't have the waiting period, has only one test, has no control sample, has no blank air test, and doesn't require any type of minimum "amount of" blow. You blow into it, it reads whatever you blow into it, however much that is. The difference here . . . is the deep lung air comes out in the Intoximeter, where with a PBT, you don't know that

---

[2] We realize, of course, that Fischer was given a blood test, not an Intoximeter test. A blood test, though, is also a quantitative test, and is administered by medical professionals.

329

> because ... you might get it if somebody blows long enough, but you may not. So there is a very big difference between the two tests.
>
> Then when you look at the Administrative Code ... the Department of Transportation Trans 311.10, there is [sic] two different types of tests in there. There is a quantitative test ... and a qualitative test .... The quantitative test is the Intoxilyzer and those types of devices. The qualitative tests are the PBT tests.

From this, the State argued that the reason the legislature did not want PBTs used in court is because these qualitative tests were not deemed to be reliable enough to be admissible.

¶ 5. Fischer's attorney, for her part, argued that Fischer had a Sixth Amendment right to present this expert testimony and that the State's arguments simply went to the weight of the evidence, which the jury could consider.

¶ 6. The trial court reasoned that the legislature deemed the PBT to be reliable enough for probable cause, but not reliable enough to be admitted into evidence for the purposes of determining guilt or innocence. The court candidly admitted that it was not sure what the exact legislative history was, but surmised that because of its "inherent unreliability and the way it's used it's really kind of a dirty, a quick and easy test that police officers can administer on the street." The court also commented that if police administered the PBT and the driver was not recorded as being under the influence, the driver could be on his or her way, and the intrusion in the driver's life would be minimal. To this end, the court concluded that the legislature never "contemplated that [the PBT] would be an evidentiary test." The court determined, therefore, that the statute

was not unconstitutional as applied to Fischer and granted the State's motion. A jury trial took place and Fischer was convicted on both the OWI and PAC charges.

¶ 7. The United States Supreme Court has set forth the following test to determine when a state's rules excluding defense evidence abridge an accused's right to present a defense. There is no abridgement of the accused's right to present a defense so long as the rule of evidence is "not 'arbitrary' " or "disproportionate to the purposes [the rule] is designed to serve." *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (citation omitted). A rule is "unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." *Id.* The "weighty interest" means the "fundamental elements" of the accused's defense. *See id.* at 315. The circuit court's decision on a procedural issue at trial may nominally be labeled discretionary, but the court's authority may not be exercised until it accommodates the accused's due process rights to present a defense. Appellate courts are therefore duty-bound to determine as a matter of law whether the defendant has been denied his or her constitutional right to present a defense in issues such as this. *State v. St. George*, 2002 WI 50, ¶ 49, 252 Wis. 2d 499, 643 N.W.2d 777. Thus, this court must review the issue de novo.

¶ 8. In *Rock v. Arkansas*, 483 U.S. 44, 55–56 (1987), the United States Supreme Court held that a court may not rely on a statute mechanistically, but must be measured against a proportionality test, balancing the restriction on the right to present a defense against "the purposes they are designed to serve." Our

331

supreme court offered guidance on how to apply this balancing test in *St. George*. It is a two-part inquiry. *St. George*, 252 Wis. 2d 499, ¶ 53. First, the defendant must satisfy *each* of the following four factors through an offer of proof:   (1) The offered testimony meets the standards of WIS. STAT. § 907.02 governing admission of expert testimony;[3] (2) The expert's testimony must be clearly relevant to a material issue in this case; (3) The expert witness's testimony is necessary to the defendant's case; (4) The probative value of the expert witness's testimony outweighs its prejudicial effect. *Id.*, ¶ 54.

¶ 9.   If the defendant successfully satisfies these four factors to establish a constitutional right to present the proffered evidence, a court undertakes the second part of the inquiry by determining whether the defendant's right to present a defense is nonetheless outweighed by the State's compelling interest to exclude the evidence. *Id.*, ¶ 55.

¶ 10.   We will discuss the second and third factors first, because they are, in our view, easily decided. We are convinced that Fischer has satisfactorily shown how Dr. Steele's analysis is relevant to the issue at hand. The issue, after all, is whether he was intoxicated at the time he was driving. If a jury were to hear Dr. Steele's opinion that Fischer, in all probability, was under .08 percent at the time he was driving, the opinion would cast light upon the subject of the inquiry. *See Zdiarstek v. State*, 53 Wis. 2d 420, 428, 192 N.W.2d 833, (1972). So, Fischer has met the second factor.

---

[3] WISCONSIN STAT. § 907.02 states:   "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

¶ 11. We also are convinced that Dr. Steele's analysis was necessary for his defense. The blood test showed him to be well over the limit. He had failed the field sobriety tests. He had to show the jury, somehow, that before the field sobriety tests, he was okay to drive. Thus, Fischer has also met the third factor in the inquiry.[4]

¶ 12. This leaves the first and fourth factors. We will assume, for the moment, that Dr. Steele's testimony also meets WIS. STAT. § 907.02 on the basis that his scientific expertise would assist the trier of fact in deciding an issue. Similarly, we will assume, again for the moment, that his testimony has "probative value" and, as such, outweighs any prejudicial effect. But it is just for the moment. We will return to these two factors soon.

---

[4] Although the trial court did not address the issue by going through each factor set forth in *State v. St. George*, 2002 WI 50, ¶¶ 53–55, 252 Wis. 2d 499, 643 N.W.2d 777, and although it did not grant the State's motion based on any particular failure in meeting the *St. George* test, it did comment that the defendant was not without recourse if he wanted to pursue an absorption curve analysis defense. The trial court observed that Fischer could have asked for an alternate test on the night in question in addition to the blood test, and the arresting authorities would have been duty-bound to administer it. The trial court implied that the expert would have been able to compare the result of the blood test at the time that it was taken, the result of the alternate test at the time that test was taken and do an analysis that way. The problem with this rationale is that there *was no* alternative test conducted. The rationale suggests that, by not requesting an alternative test after arrest, a defendant waives his or her right to have a lawyer seek an expert opinion using the historical facts that *did* in fact occur. Lawyers, not defendants, waive arguments and opportunities to present evidence based on the facts that are present. We are at a loss to find any law supporting the trial court's rationale.

¶ 13. We jump to the second part of the analysis —whether Fischer's right to present the proffered evidence is nonetheless outweighed by the State's compelling interest to exclude the evidence. As the supreme court said in *County of Jefferson v. Renz*, 231 Wis. 2d 293, 312–16, 603 N.W.2d 541 (1999), the legislature intended the PBT to function as a preliminary screening tool, to be used by an officer during investigation of a person suspected of an OWI violation. As the court noted in *Renz,* the legislature used the word "preliminary" for a specific reason:   to denote that the PBT is "a preparation for something else." *Id.* at 313. That something else is "probable cause." Inherent in Wis. Stat. § 343.303, then, is the legislature's decision that PBT results are sufficient information to determine only whether an officer has probable cause to arrest. But, it appears that the legislature has also determined that the results are not sufficiently reliable for jury consideration in determining guilt or innocence.

¶ 14. Unlike the Intoximeter, the PBT is not tested for accuracy either immediately before or after a test. The intoximeter is a "quantitative" test and the PBT is a "qualitative" test. These words alone suggest a world of difference between the two. Wisconsin Admin. Code § Trans 311.03(13) defines a *quantitative* breath alcohol analysis as "a chemical test of a person's breath which yields a specific result in grams of alcohol per 210 liters of breath." In contrast, § trans 311.03(12), defines a *qualitative* breath alcohol analysis as "a test of a person's breath, the results of which indicate the presence or absence of alcohol."

¶ 15. Clearly, the former test calls for an accurate "measurement;" that is, after all, the definition of the word "quantitative"—something "involving the measurement of quantity or amount." Webster's Third New

INT'L DICTIONARY 1859 (3d ed. 1993). A qualitative analysis, as any chemistry major would know, merely determines the constituents of a substance without any regard to the quantity of each. *Id.* at 1858. Thus, as succinctly defined in the administrative code, the qualitative breath test is for the purpose of determining only whether alcohol is present or not.

¶ 16.   Fischer points to WIS. ADMIN. CODE § TRANS 311.10(2), which tells how a qualitative test, such as the PBT, must be tested for accuracy. And it is true that the code explains that each instrument is "checked" by an individual holding a valid permit to operate it, that the check must be conducted at regular intervals and, in so doing, the permit holder must use a calibrated unit which has the approval of the DOT's transportation section. *Id.* But this code provision does not mean that the PBT is tested for accuracy at the time the test is administered. Nor does it mean that the exact quantity of alcohol in the breath at the time the PBT is administered is capable of being measured. All the code does is set up a procedure for determining whether the device is capable of detecting the presence or absence of alcohol to a degree credible enough that the law enforcement officer on the street can trust it in his or her determination of probable cause.

¶ 17.   Therefore, the testing mechanism for the PBT is simply not designed so the result obtained during the investigation of a possibly intoxicated driver is accurate enough that it can be used to help a jury determine the driver's guilt or innocence. The legislature did not want the PBT admitted as evidence for that reason. The reason applies whether it is the State that wants to use the PBT results or the defendant who wants to use it. We conclude that the State's interest in

335

not allowing PBT evidence in the courtroom in OWI trials is legitimate and overrides Fischer's interest in presenting Dr. Steele's testimony.

¶ 18.  Fischer asserts that it does not matter whether the legislature meant for the PBT to be a screening device or whether it can be tested before and after use. In his view, the fact that it cannot be tested for measurement does not answer the question of whether the State has a legitimate interest in preventing the use of PBT evidence in his case. He cites Wis. STAT. § 907.03, which he claims is the correct answer to the question of whether the State has a legitimate reason to apply the generic statute to his case. This statute reads:

> **Bases of opinion testimony by experts**. The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type *reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject,* the facts or data need not be admissible in evidence.

Sec. 907.03 (emphasis added).

¶ 19.  Fischer cites three sources to argue that the PBT is an instrument reasonably relied upon by experts in Dr. Steele's field: (1) cases from other jurisdictions where appellate courts have allowed experts to give an opinion based on a PBT result, (2) a DOT article trumpeting its use, and (3) Dr. Steele's own qualifications as an expert in the methodology of science and the validation of instrumental techniques. For this reason, Fischer contends that Dr. Steele's opinion is admissible under Wis. STAT. § 907.03, and the question of whether Dr. Steele's opinion is reliable is for the jury to determine. Thus, he claims, the State has no legitimate interest in applying the general PBT statute because the State may

cross-examine and argue to the jury that Dr. Steele's opinion is unreliable since the PBT is not tested for accuracy.

¶ 20. First, we must state the obvious. If, as Fischer concedes, our United States Supreme Court has declared that states have broad latitude under the U.S. Constitution to establish rules excluding evidence from criminal trials, and if a state has made such an exclusion, then allowing defendants to admit the excluded evidence just because the State could cross-examine or offer contrary evidence would emasculate the exclusion. To buy into what Fischer argues, we would have to conclude that any rule excluding evidence takes a back seat to a defendant's desire to admit such evidence, just because the State could rebut the evidence if it wished. That cannot be the law.

¶ 21. Second, the issue is not the "reliability" of Dr. Steele's opinion, but the "validity" of his opinion. There is a distinct difference between "reliability" and "validity." While "reliability" determinations are for the jury under Wisconsin law, "validity" questions are for the circuit court in its limited gate-keeper capacity. To illustrate the difference, consider that a person's bathroom scale may repeatedly record the same weight for a person every morning—give or take a pound, either way. That person may believe the scale and think it is reliable—based on repeated experience with it. But what if the scale is off—say five pounds off—and the person owning the scale does not know it? The results may be reliable as far as that person is concerned, but that does not make the results valid.

¶ 22. Similarly, Dr. Steele can compare the PBT result with a blood test result 100 times and be convinced as to the reliability of his absorption curve analy-

sis. But is his analysis valid? We must answer the question "no" because Fischer's PBT result is not an empirically tested measurement. The PBT result in Fischer's case may have been 100% accurate or it may have been 100% inaccurate. It may have been a little off or it may have been way off. We do not know. And neither does Dr. Steele. The problem, however, is that Dr. Steele is offering an opinion of nonintoxication based on a test—a test that he is asking the jury to assume to be bona fide measurement, but whose result is, in fact, unfalsifiable because it cannot be measured at the time of the test.

■

¶ 23. Why allow an expert, one with a science background, to rely on a test whose accuracy at the time of the test cannot be authenticated as a foundation for an opinion? That makes no sense. Do scientists in Dr. Steele's field, or any other scientific field for that matter, reasonably rely on data that is not designed to be empirically measured with exact accuracy at the time of the test? We have no evidence that this is so. Therefore, we conclude that Wis. Stat. § 907.03 has no application to this case.[5]

■■

¶ 24. That brings us back to the two remaining factors in the *St. George* analysis that we momentarily assumed were present—whether the expert witness met the standards of Wis. Stat. § 907.02 and whether the probative value of the testimony of the defendant's

---

[5] This is not to say that qualitative tests are always invalid. There are many qualitative types of evidence whose foundations have been shown to be valid, *e.g.*, battered women's syndrome. We limit our discussion to the qualitative test conducted in this case.

expert witness outweighs its prejudicial effect. Section 907.02 asks whether the scientific or specialized knowledge of the proposed expert will assist the trier of fact to understand the evidence of a fact in issue. We are convinced that if the underlying basis for the opinion is a result that cannot be tested for accuracy at the time of the test, then it cannot assist the trier of fact. Similarly, such an opinion has no probative value, but is an opinion built much like a house of cards. If the foundation breaks down, the house breaks down. We affirm the trial court's ruling excluding Dr. Steele's opinion.

*By the Court.*—Judgment affirmed.