**2020 WI App 43**

# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.: 2018AP999-CR

†Petition for Review filed

Complete Title of Case:

**STATE OF WISCONSIN,**

            **PLAINTIFF-RESPONDENT,**

      **V.**

**MARK J. BUCKI,**

            **†DEFENDANT-APPELLANT.**

| | |
|---|---|
| Opinion Filed: | June 2, 2020 |
| Submitted on Briefs: | August 27, 2019 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Stark, P.J., Hruz and Seidl, JJ. |
| Concurred: | |
| Dissented: | |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *James Rebholz* of *Rebholz & Auberry*, Wauwatosa. |
| Respondent ATTORNEYS: | On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Joshua L. Kaul*, attorney general, and *Aaron R. O'Neil*, assistant attorney general. |

COURT OF APPEALS
DECISION
DATED AND FILED

June 2, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

| | |
|---|---|
| **Appeal No. 2018AP999-CR** | **Cir. Ct. No. 2013CF157** |
| **STATE OF WISCONSIN** | **IN COURT OF APPEALS** |

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

MARK J. BUCKI,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Lincoln County: JAY R. TLUSTY, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

¶1      HRUZ, J.  Mark Bucki appeals a judgment of conviction, entered following a jury trial, for first-degree intentional homicide, strangulation, and hiding a corpse, all involving his estranged wife, Anita.  Bucki argues he is entitled to a new trial because the circuit court erroneously exercised its discretion when it

admitted two forms of canine scent evidence: (1) opinions from handlers of cadaver dogs that their dogs had alerted to the scent of human remains at various locations on Bucki's property; and (2) opinions from handlers of trailing dogs that their dogs had detected in the area where Anita's body was found the scent from a pair of tennis shoes taken from Bucki's residence. Bucki argues the court should not have admitted this canine scent evidence because it was not corroborated by any physical evidence and because it was of low probative value and was highly prejudicial.

¶2 We conclude the circuit court did not erroneously exercise its discretion when it decided to admit the canine scent evidence. It is undisputed that this case involves expert testimony under WIS. STAT. § 907.02 (2017-18).[1] Following a two-day evidentiary hearing on the admissibility of the canine scent evidence, the court conducted a lengthy analysis in which it identified and applied the proper factors under that statute. We reject Bucki's request for a categorical rule that would condition the admissibility of relevant canine scent evidence on there being physical or forensic evidence corroborating the dog alerts. Rather, expert testimony regarding dog alerts, like all other expert testimony, may be admitted if the court concludes it satisfies the threshold reliability criteria in § 907.02 and is not otherwise subject to exclusion under WIS. STAT. § 904.03.

¶3 Bucki also appeals an order denying his postconviction motion seeking a new trial based on the alleged ineffective assistance of his trial counsel. In particular, Bucki argues his trial attorneys violated his Sixth Amendment right to counsel by failing to call his own canine scent expert at trial; failing to present evidence that Anita had on one occasion worn the tennis shoes used in the trailing

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

dog search, thereby contaminating them; and failing to sufficiently challenge the State's theory that an area of disturbed earth on Bucki's property was an abandoned burial site for Anita's body. We conclude Bucki's trial attorneys did not perform deficiently, and we affirm the judgment and order.

## BACKGROUND

¶4      On the evening of April 26, 2013, the Lincoln County Sheriff's Office received a call from Bucki reporting that his wife, Anita, was missing from their residence in the Town of Corning. Investigators who responded to the call believed there were suspicious circumstances surrounding Anita's disappearance. In particular, they noted a strong odor of cleaner in the garage, handprints on the bed of Bucki's truck, and that the driveway appeared to have been recently graded. They contacted lieutenant Mark Gartmann, who walked the property and then spoke to Bucki in the residence.

¶5      Bucki told Gartmann that he and Anita had separated a few weeks earlier and that she had been staying with a friend in Wausau. According to Bucki, Anita had visited him at their residence at approximately 9:00 p.m. the night before, on April 25th. Bucki and Anita talked for a few hours, during which Anita expressed that she did not want a divorce. Bucki told Gartmann he had been dating another woman, and he admitted to raising his voice with Anita while discussing the potential divorce. Bucki claimed he went to bed in the bedroom around midnight and Anita was planning to sleep at the residence overnight on the couch.

¶6      Bucki continued that when he awoke around 5:00 a.m., Anita was gone. Her purse, jacket and cell phone were still in the residence. Bucki told Gartmann he left the residence and the property to look for Anita on the morning of April 26th, and then in the afternoon he cleaned out some of Anita's items from the

residence, tore carpet out of a bedroom, and burned some items in a burn barrel on the property. Bucki was supposed to go to an auction with his nephew on the 26th, but that morning he sent his nephew a text message canceling the meeting due to "[two] woman issues." Bucki also claimed Anita had sent him a text message earlier that month instructing him to split some life insurance money with their son, Clint, if anything happened to her. Bucki told Gartmann that, financially, things had "really [been] going backwards" for him.

¶7 After interviewing Bucki, officers continued to search around the residence. Further scrutiny of the truck bed revealed what looked like human handprints in the dust on the passenger side. Additionally, officers noted markings in the dust that appeared as if something lying in the truck bed had been dragged out. The bed on the driver's side of the truck looked to have been cleaned and smelled like orange cleaner; there was no dust on that side. Police searched the property for Anita into the night, to no avail.

¶8 Police executed a multi-day search warrant of Bucki's residence beginning on April 30, 2013. During the course of the search, police used two dogs trained to alert for the scent of human remains, commonly known as "cadaver dogs." On April 30, then-Madison Police Department officer Solon McGill brought his cadaver dog, Izzy, to the residence. On May 1, police brought retired Waupun Police Department lieutenant Jeanne Frost to the property with her cadaver dog, Trixie. Both cadaver dogs alerted at various places on the property, indicating they detected the scent of human remains.

¶9 At trial, McGill testified that Izzy was off-lead and went into the garage where the truck was located. Izzy alerted near the rear driver's side wheel well of the truck and in the truck bed. Izzy then went to a second, larger garage on

the property and alerted to an open-top trailer attached to an all-terrain vehicle (ATV). Izzy also alerted on a large metal roller, which McGill testified was "the type that you tow behind a tractor or ATV to flatten out your lawn." In the yard, Izzy alerted to a burn barrel; Izzy also alerted to a shallow, rectangular area of disturbed earth near an ATV trail, which was approximately three feet wide and five feet long and which appeared to have been created by digging. Inside the residence, Izzy indicated the scent of human remains on the bedroom floor where carpet had been removed and on a shower drain in a bathroom.[2]

¶10 The following day at the residence, Frost's dog, Trixie, alerted to the scent of human remains in the area of some logs and a tarp that law enforcement requested Trixie to search. Frost then brought Trixie into the larger garage, where Trixie alerted on the driver's side foot rest of the ATV and on the attached trailer. Trixie did not indicate the scent of human remains on the pickup truck in the smaller garage. She did, however, alert on the burn barrel, which by that point had been sealed as evidence and placed in a law enforcement trailer in the driveway.[3] Once inside the residence, Trixie alerted on the area with the torn-out carpeting.

¶11 On May 10, 2013, two pedestrians discovered Anita's body approximately forty feet east of a highway in Taylor County, near a culvert. The body was in a moderate state of decomposition and had to be identified by dental

---

[2] Izzy was also instructed to search two ponds near the Corning Town Hall in relation to the missing person case. She alerted near the smaller of the two, but neither McGill nor other law enforcement officers were able to associate that alert with Bucki. McGill testified the scent of human decomposition is not person-specific, and the area in which Izzy alerted was swampy with a lot of water movement. McGill speculated the alert could have been the result of runoff from a burial land or areas where stillborn babies were buried by farmers.

[3] Frost had officers remove the barrel from the trailer to increase her confidence in Trixie's alert. The barrel was placed in two different locations in the driveway; each time Trixie alerted to it.

records. The body had seven "sharp force injuries" to the chest consistent with stabbing by a single-edged knife. The body also had blunt trauma to the neck, which the medical examiner opined was "a classic hallmark for an application of a strangulation hold."

¶12 On the day Anita's body was discovered, law enforcement requested assistance from two individuals with trailing dogs, which are dogs trained to detect and trail the scent of a particular individual.[4] Joanne Disher, who was a civilian assisting the law enforcement investigation, was the first to arrive with her trained bloodhound, Pollie.[5] Officers gave Disher a tennis shoe they had taken from Bucki's residence, which the officers said belonged to Bucki. Disher placed a sterile gauze pad in the toe of the shoe for a few minutes, and then introduced Pollie to the law enforcement personnel present at the scene to eliminate their scents, a procedure known as "dismissal." Disher walked Pollie north of the scene, presented her with the gauze scent pad, and issued a "find" command. Disher described how Pollie began on the west side of the road working south, then started "pulling extremely hard" to the east and went down in the culvert area where Anita's body was found. Pollie came out of the culvert, continued walking south on the east side of the road for approximately 140 feet, then turned around and headed north along the road. At that point, Disher was confident that the scent from the shoe was present at the location of Anita's body.

---

[4] Anita's body had been removed by the time the trailing dogs and their handlers arrived at the scene. The handlers testified that prior to trailing with their dogs, they were unaware of the specific location where Anita's body had been discovered.

[5] Disher had previously assisted law enforcement during the search for Anita, when it was still regarded as a missing person case.

¶13 Vilas County Sheriff's Department detective Louise Horn also brought her bloodhound, Missy, to the area to conduct a trailing investigation. After dismissing the scents of law enforcement officers present, Horn presented Missy with another tennis shoe from Bucki's residence and gave her the "start" command.[6] Missy "committed to a track," meaning she became focused and started moving forward. Missy started south of barricades that were erected around the crime scene, and then she went north along the east side of the road, maneuvered around the barricade, continued north along the road, then stopped and returned to Horn. Horn testified that based upon her training and experience, Missy's actions demonstrated that the person whose scent was on the shoe was present at the scene and likely drove away in a vehicle.

¶14 The State ultimately charged Bucki with one count each of first-degree intentional homicide, hiding a corpse, and strangulation. Bucki filed a motion to exclude all evidence regarding the State's use of the cadaver and trailing dogs. Bucki noted the admissibility of such evidence had not been addressed by Wisconsin courts, and he urged the circuit court to reject the evidence on two grounds: (1) it did not meet the admissibility standards for expert testimony set forth in WIS. STAT. § 907.02, which adopted evidentiary standards consistent with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); and (2) the evidence's probative value was substantially outweighed by the dangers of unfair prejudice, confusion of the issues, or misleading the jury under WIS. STAT. § 904.03. The State moved separately to admit the evidence.

---

[6] The shoes were part of a pair, and the circuit court found during postconviction proceedings that separate tennis shoes were provided to each dog handler. The shoes were a men's size twelve or thirteen.

¶15    Following a two-day evidentiary hearing, the testimony from which we develop further below, the circuit court determined the handlers' testimony regarding the cadaver and trailing dogs' responses was admissible at trial. The court found the evidence was relevant and probative, and it was not likely to unfairly prejudice Bucki, confuse the issues, or mislead the jury. Evaluating whether the handlers' testimony was admissible under WIS. STAT. § 907.02, the court found that their testimony would be helpful, the handlers were qualified to offer expert testimony, and their opinions were based on sufficient facts or data. Additionally, citing a number of factors that we discuss more fully below, the court determined that the handlers' conclusions were based on reliable principles and methods, and that the handlers had applied those principles and methods reliably to the facts of this case.

¶16    At the hearing, Bucki also asserted that the admissibility of the dog handlers' testimony was contingent upon the State introducing other evidence corroborating that Bucki had killed his wife. Regarding the trailing dogs, Bucki suggested that such corroboration would include "other physical evidence at the scene, something from the defendant where Anita Bucki was found. Some DNA, something of his there; not just the possibility of his scent." As to the cadaver dogs, Bucki proposed the State needed physical evidence, such as hair or blood, showing Anita's corpse had been present at the residence. The circuit court concluded that such corroboration was not necessary for admissibility under *Daubert* and that any challenges to the evidentiary bases for the handlers' opinions affected the weight of the handlers' testimony and not its admissibility.

¶17    Bucki's case proceeded to a jury trial, which was held over eight days in April 2014. The State acknowledged its case was entirely circumstantial, but the prosecutor argued the evidence was quite compelling: he highlighted "more than

[forty] circumstances" that pointed to Bucki's guilt. Bucki testified in his own defense and denied killing Anita or knowing who had caused her death. The jury found Bucki guilty on all counts. The circuit court ordered Bucki to serve a life sentence for the homicide, with extended supervision eligibility after thirty-five years. Bucki was ordered to serve a concurrent four-year sentence for hiding a corpse and a concurrent three-year sentence for strangulation.

¶18 In June 2016, Bucki sought a new trial. He alleged his trial attorneys provided constitutionally ineffective assistance by failing to present at trial expert witness testimony from a veterinarian and professor, Dr. Lawrence Myers, who had testified at the *Daubert* hearing in support of Bucki's motion in limine. Additionally, Bucki attached an affidavit from Clint Bucki, his son, in which Clint averred that on one occasion in 2010 he had witnessed his mother wearing the tennis shoes that were used by the trailing dogs. Bucki alleged his trial attorneys were ineffective by failing to present this testimony at trial. Finally, Bucki asserted his trial attorneys were ineffective by failing to challenge the prosecution's theory that the patch of disturbed earth in the yard was an abandoned grave site for Anita's body.

¶19 The circuit court denied Bucki's postconviction motion following a two-day *Machner* hearing.[7] The court concluded Bucki's trial attorneys were not deficient for failing to call Myers, instead finding that his attorneys reasonably concluded Myers was a weak witness and that they had adequately exposed the flaws in the State's canine scent evidence at trial through cross-examination of the State's witnesses. Regarding Clint's affidavit, the court concluded the evidence did not demonstrate that Bucki's attorneys were deficient, as Clint had informed them

---

[7] *See State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979).

9

prior to trial that he could not testify with certainty that his mother had worn the tennis shoes on any occasion. As for the prosecution's theory regarding the area of disturbed earth, the court noted Bucki's defense attorneys had successfully obtained a pretrial order prohibiting any reference to the area as a "shallow grave" and had highlighted during closing argument that nothing of evidentiary value was found in the disturbed dirt. Because there was no evidence at either the trial or the *Machner* hearing to suggest that anyone other than Bucki had dug up the area on the property, the court concluded Bucki's trial attorneys had not performed deficiently by failing to more thoroughly rebut the State's theory.

¶20    Alternatively, the circuit court concluded that even if the jury had totally discounted the canine scent evidence and the evidence regarding the area of disturbed earth, there was no reasonable probability that the outcome of the trial would have been different. The court concluded the State's circumstantial case was "significant," of which the canine scent evidence and the evidence regarding the area of disturbed earth were "only a small portion." The court noted the persuasiveness of the other circumstantial aspects of the case recited by the State, as well as the fact that "two people out for a walk found Anita Bucki's body in an area approximately twelve miles directly west of the defendant's residence, in an area the defendant was familiar with." Bucki now appeals the judgment of conviction and the order denying his postconviction motion.

**DISCUSSION**

¶21    Bucki's appellate arguments generally fall into two categories. First, he challenges the admissibility of the canine scent evidence at trial, asserting that it was necessary under the "sufficient facts or data" prong of WIS. STAT. § 907.02 for the State to have corroborating physical or forensic evidence showing that Anita's

10

corpse was present at the residence or that Bucki was present at the scene where her body was recovered. Absent such corroboration, the canine scent evidence was, in Bucki's view, of low probative value, unreliable, and should have been excluded under WIS. STAT. § 904.03 as unfairly prejudicial and likely to mislead the jury. Second, Bucki argues his attorneys were constitutionally ineffective for the reasons he raised in his postconviction motion.

*I. Admissibility of the Canine Scent Evidence*

¶22 Questions regarding the admissibility of evidence lie within the circuit court's discretion. *State v. Jones*, 2018 WI 44, ¶27, 381 Wis. 2d 284, 911 N.W.2d 97. We will affirm the court's evidentiary determinations unless the appellant demonstrates that the court erroneously exercised its discretion. *State v. Ringer*, 2010 WI 69, ¶24, 326 Wis. 2d 351, 785 N.W.2d 448. A proper exercise of discretion requires the court to examine the relevant facts, apply the correct standard of law, and use a rational process to arrive at a conclusion that a reasonable judge would reach. *State v. Scott*, 2018 WI 74, ¶39, 382 Wis. 2d 476, 914 N.W.2d 141. We independently determine, however, whether the court applied the correct standard of law, and we decide de novo the correct interpretation and application of any relevant statutes. *Jones*, 381 Wis. 2d 284, ¶27.

¶23 The admissibility of expert testimony is governed by WIS. STAT. § 907.02, which incorporates the federal standard under *Daubert*. *Jones*, 381 Wis. 2d 284, ¶7. Following its amendment in 2011, *see* 2011 Wis. Act 2, §§ 34m, 37, the statute now requires that a circuit court make five determinations before admitting expert testimony: (1) whether the scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue; (2) whether the expert is qualified as an expert by knowledge, skill,

experience, training or education; (3) whether the testimony is based upon sufficient facts or data; (4) whether the testimony is the product of reliable principles and methods; and (5) whether the witness has applied the principles and methods reliably to the facts of the case.[8] *See Jones*, 381 Wis. 2d 284, ¶29. In answering these questions, courts can consider a variety of factors, including whether the evidence can (and has been) tested, whether the theory or technique has been subjected to peer review and publication, the known or potential error rate, the existence and maintenance of standards controlling the technique's operation, and the degree of acceptance within the relevant scientific or other expert community. *Id.*, ¶8.

¶24 The *Daubert* standard adopted by WIS. STAT. § 907.02 "is flexible but has teeth." *State v. Giese*, 2014 WI App 92, ¶19, 356 Wis. 2d 796, 854 N.W.2d 687. "The goal is to prevent the jury from hearing conjecture dressed up in the guise of expert opinion." *Id.* The court must focus on the principles and methodology on which the expert relies, not the conclusion he or she reaches. *Id.*, ¶18.

---

[8] The full text of WIS. STAT. § 907.02 is as follows:

(1) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

(2) Notwithstanding sub. (1), the testimony of an expert witness may not be admitted if the expert witness is entitled to receive any compensation contingent on the outcome of any claim or case with respect to which the testimony is being offered.

¶25    Here, the circuit court thoroughly vetted the admissibility of the State's canine scent evidence.  During the two-day evidentiary hearing on Bucki's motion in limine, the State presented testimony from McGill, Horn, Frost, Disher and agent Rex Stockham, the Forensic Canine Program manager at the Federal Bureau of Investigation (FBI).  Bucki countered with testimony from his expert, Dr. Myers.  The court then conducted a lengthy oral analysis of the evidence and legal standards to arrive at its conclusion that the evidence was admissible at trial.  We summarize the evidence, as well as the court's rationale, before addressing the broader legal issue that Bucki raises—whether the admissibility of the canine scent evidence was contingent on the State presenting some form of corroboration.[9]

### A.  The *Daubert* Hearing

¶26    McGill, who was the first to testify at the pretrial hearing, said that he was familiar with peer-reviewed studies and other literature relating to human decomposition and scent.  According to the literature, a decaying human body emits 478 volatile organic compounds, 30 of which are specific to humans.  Odors from the compounds begin being emitted approximately four minutes after death; the emissions accelerate as the chemical and mechanical breakdown of the body continues.  McGill explained that dogs have a greater number of scent receptors than humans, and their noses and organs are structured in a way that allow for a greater period of contact with those cells and ability to detect and analyze scents.  McGill continued that cadaver dogs are trained to alert to residual odors, not to the

---

[9] Additionally, the summary provided here further frames the ineffective assistance of counsel issues Bucki raises, one of which pertains to the defense's decision not to call Dr. Myers to testify.

scent source, in the same way that humans can smell food in an area even after it has been consumed.

¶27 McGill acknowledged that there were only a few scientific studies that had evaluated the reliability of cadaver dogs specifically. He discussed one German study in particular, in which three cadaver dogs had been tested in their responses to carpet samples that had been exposed to decomposing human tissue for varying amounts of time.[10] McGill testified that in the study, the dogs "were still reliably indicating on the carpet samples that had been exposed to human remains, but not to the ones that had not been exposed to human remains," for up to thirty-five days for the samples that had been exposed for two minutes, and up to sixty-five days for the samples that had been exposed for up to ten minutes. Out of a total 354 experiments with the carpet samples, the canines correctly alerted 339 times.

¶28 McGill began formally training Izzy in detecting human remains in 2011. The training generally involved the use of verbal commands and reward toys, working up to the point where Izzy would deliver a final response (in Izzy's case, a "sit")—i.e., an "alert"—at the location where she detected the most significant source of odor. McGill testified that part of Izzy's training was learning to distinguish the scent of a decaying human body from the scents emitted by animal remains. During training he used different types of human remains in a variety of stages of decomposition, including hair, brain matter, blood and bone. Additionally, Izzy's training involved items that had previously been in contact with human remains, simulated crime scenes that had been cleaned with a variety of substances,

---

[10] *See generally* L. Oesterhelweg et al., *Cadaver Dogs—A Study On Detection Of Contaminated Carpet Squares*, 174 FORENSIC SCI. INT'L 35-39 (2008).

attempts at misdirection, and outdoor locations exposed to the elements. Izzy's training records were admitted into evidence.

¶29 Additionally, McGill testified regarding Izzy's performance in "real-world" searches, in particular a missing person case in which a body was found in a lake a short distance from an area of ice on which Izzy had alerted.[11] McGill testified that several national organizations certify scent detection dogs and Izzy had been certified as a cadaver dog by the National Narcotics Detector Dog Association. McGill testified that Izzy's responses were generally accurate during testing and that she had proven to be reliable at detecting human remains in various scenarios. McGill did not believe Izzy had made a false positive alert, but he acknowledged she had produced a few false negative alerts early in her training.[12]

¶30 Frost provided similar testimony to McGill's regarding her cadaver dog, Trixie. Frost testified she had been handling cadaver dogs since 2008, was an accredited master trainer of such dogs, and had taught several workshops on canine detection of human remains. She stated the same principles underlying narcotics dog training are applicable to cadaver dog training; in her words, "[i]t's just a different odor." Frost testified she was familiar with the "Cadaver Dog Handbook" authored by Andrew Rebman, which she considered an authoritative book in the field of cadaver dog training. Frost stated she was also familiar with the German

---

[11] At trial, McGill testified that he and Izzy had been involved in four searches for human remains and had discovered human remains in only one of those cases. It is unclear whether the lake search, which was apparently a missing person case, was included in this count, or what the results of the other cases were.

[12] McGill testified that a false positive occurs when a canine alerts on a sample that has not been exposed to human remains. Conversely, a false negative occurs when the dog fails to alert on a sample that has been so exposed.

cadaver dog study McGill had discussed and with other peer-reviewed publications on the subject.

¶31     Trixie was certified by the North American Police Work Dog Association in 2009 and had received other certifications from disaster search and rescue organizations. Frost testified that during Trixie's training and during the search of Bucki's residence, she followed the best practices guidance published by the Scientific Dog Working Group, a consortium of trainers and scientists that study the canine olfactory system.

¶32     Trixie's training records were admitted into evidence. Like Izzy, Trixie was taught to distinguish between human and animal remains. Frost, too, used different types of human tissue at different stages of decomposition when training her dog, and she used "proofing" (the placement of items with no decomposition scent) to measure Trixie's accuracy. During training, Trixie would reliably alert to the scent of human remains in an area for as long as three to four weeks after the human tissue had been removed.[13] Frost estimated that in training, Trixie had an approximately ninety percent success rate. Frost acknowledged that "[e]very dog is wrong at some point or another," and she testified that in eight to ten percent of cases, Trixie would provide a false negative or, more commonly, a false positive. Frost admitted that it was possible for a cadaver dog to alert to human

---

[13] Frost also testified that Trixie was tested in areas where human remains had been cleaned or obscured. For example, in one training exercise, Frost smeared blood and human tissue on the wall of an abandoned hotel, then painted over it several times. When she returned with Trixie several months later, Trixie alerted to the odor of human remains.

tissue that was not a corpse, such as skin left on a hot burn barrel after a person touched it.

¶33 Both McGill and Frost addressed defense concerns about "cuing" and reliability. McGill testified that "cuing" occurs when a handler or other person intentionally or inadvertently "tips off" the dog that he or she wants to obtain an alert.[14] Izzy's training involved efforts to "ensure that the greatest association between her reward and any action was her discovery of the odor rather than any actions" by McGill. To minimize cuing, McGill allowed Izzy to work off-lead a significant distance in front of him in an effort to decrease their interactions, and Frost tested Trixie in areas with distractions like noise, people or running vehicles. Additionally, the handlers sought to minimize the dogs responding merely to visual cues, like disturbed earth, by creating "false holes" with no training aids in them.

¶34 Izzy and Trixie were both trained using blind problems, which are problems set up by other individuals with the handler having no knowledge of the training aid being used or its location. Additionally, Trixie participated in double-blind certification testing, a type of testing where neither the handler nor the person evaluating the dog-handler team knows where the odor sources are located. With respect to Trixie's May 1, 2013 search, Frost was not told that another cadaver dog had previously searched the property and was not given any information about areas of suspicion.

¶35 At the same pretrial hearing, the circuit court heard evidence from Horn and Disher about the training and reliability of the trailing dogs. Horn testified

---

[14] McGill cited a study involving horses from the early 1900s, in which it was found that a horse was not, in fact, able to count and do addition but, rather, was responding to the body language of the handler to make the correct number of "foot stomps."

she had been working with bloodhounds since 1994 and had extensive training with the National Police Bloodhound Association. She testified that bloodhounds track a person's scent by following "skin rafts," which are cells that are shed from a person's body at a rate of, potentially, millions per second. Horn stated she was familiar with peer-reviewed studies concerning bloodhound reliability, including a 2003 study published in the Journal of Forensic Sciences. That study showed, according to the authors, that veteran bloodhounds "can trail and correctly identify a person under various conditions. These data suggest that the potential error rate of a veteran bloodhound-handler team is low and can be a useful tool for law enforcement personnel."[15]

¶36 Horn's purebred bloodhound Missy was nearly six years old at the time she became involved in Anita's murder investigation. Horn began all of her bloodhounds with "motivational training," in which the dogs were given a scent article from a "track layer" (i.e., the person the dog was instructed to track). Gradually, Horn added factors to challenge the dog, including increasing the length of the track, "aging" the track, incorporating decoys and cross-tracks, and working in areas contaminated with different scents. Training logs showed Missy had completed 163 total training exercises and had been certified through two work dog associations, although only one certification was active at the time of the search.

¶37 Horn testified the environmental factors in the area of interest on May 10, 2013, were acceptable for trailing. Horn took steps to avoid any "cuing" concerns. She testified that, based upon Missy's behavior and the officers' representation that the shoe belonged to Bucki, she believed Bucki had been present

---

[15] Lisa M. Harvey & Jeffrey W. Harvey, *Reliability of Bloodhounds in Criminal Investigations*, 48 J. FORENSIC SCI. 811-16 (2003).

at the scene and had arrived and departed in a vehicle. Horn acknowledged that Missy did not enter the ditch while trailing, and she believed that if Missy had been trailing Anita's scent, Missy would have concluded the trail at the location where Anita's body was found (i.e., in the ditch). Horn also did not agree with Bucki's counsel that Missy's failure to enter the ditch suggested that Bucki had not been present in the ditch; rather, she testified that Missy was not trained to track "footstep to footstep" and that the scent may have "pooled" against a barrier like the swamp line. Horn acknowledged the possibility of mixed scents on clothing articles and stated that, in such cases, the dog would follow the "predominant scent."

¶38 Disher, who was not a law enforcement officer, testified she began training bloodhounds for search and rescue operations in 1992 to assist in missing persons cases. Disher attended seminars throughout the United States from various law enforcement and search canine groups. Disher explained that she began training Pollie, her purebred bloodhound, at eight weeks of age, essentially by having someone play "hide and seek" and rewarding Pollie for finding the person. Pollie was nine years old at the time of the *Daubert* hearing.

¶39 Many aspects of the trailing dogs' trainings were similar. Missy and Pollie were tested on "blind" trails, which were unmarked trails that were also unknown to the dogs' handlers. Both used "aged" trails during training, with Pollie in particular being able to accurately follow a scent trail after the source of a scent had been removed from the area for approximately one month. Additionally, Pollie tested well on "split trails," where two individuals would walk together and then separate. Missy and Pollie both tested well using "negative trails," where they were given a person's scent and then taken to an area where that person had never been to see if the dog would react. Horn and Disher both acknowledged their dogs were

not perfect; for example, each of them testified their dog would at times "shortcut" a track.

¶40 The defense countered the handlers' testimony with testimony from Dr. Myers, an associate professor at the College of Veterinary Medicine at Auburn University. Myers agreed that dogs can distinguish between scents and can be trained to use their sense of smell on command. More specifically, he agreed that dogs can be trained to alert to the scent of human remains and to trail a person by their scent. Myers represented, however, that there was no scientific consensus on some specific issues, such as how long the scent of human decomposition or human activity remains in an area, and he generally opined that any certification program that did not include repeated double-blind testing was inadequate. He also took issue with several of the peer-reviewed studies discussed by the handlers on the basis that the studies were not adequately blinded.

¶41 Myers also discussed general training problems that had been raised during the handlers' testimony, including possible scene contamination and cuing, although he conceded he had no evidence that those concerns were present with any of the canine activities in relation to Anita's disappearance. Indeed, Myers testified that his two "major issues" in this case were the lack of training records showing double-blind testing and that the "level of contamination" at the scenes was "truly unknown."[16]

¶42 Following rebuttal testimony from Frost and Horn, the State called Stockham as a witness. Stockham testified that he developed the FBI's Human

---

[16] Myers did not explain the "scene" to which he was referring—that is, the culvert area or the Bucki residence, or both. As to Myers' critique regarding the lack of double-blind testing, he acknowledged Trixie had participated in such testing, but he stated he "didn't have any figures on that from the testimony."

Scent Evidence Team Program, which later became the Forensic Canine Program. Using information from dog trainers, Stockham wrote the training protocols for the FBI's Human Scent Evidence canines and then used those protocols to train dogs. He testified he had participated in over 2,000 searches in criminal investigations using dogs and had written two peer-reviewed articles concerning the use of scent dogs. Stockham testified he knew the "very small community" of scientists working with dogs that detect human remains, and Myers was not part of that community.

¶43    Stockham further testified as to his ultimate opinion that properly trained cadaver and trailing dogs are reliable. Having reviewed the dogs' training records in this case, he opined that the handlers had conducted the proper training activities, including "proofing" for the cadaver dogs and the use of aged trails, contaminated trails, and, most importantly, negative trails for the trailing dogs.[17] Stockham stated that the use of a tennis shoe was proper for a trailing dog because he found "that people don't loan shoes to other people often." He further testified that blind testing was sufficient and that double-blind testing, while valuable, made it difficult to evaluate the canine-handler team.

*B. The Circuit Court's Decision*

¶44    On appeal, Bucki concedes that the circuit court "relied on and applied the factors outlined" in WIS. STAT. § 907.02 and ***Daubert*** when ruling on the admissibility of the cadaver and the trailing dog evidence. In other words, Bucki does not take issue with the analytical framework the court applied. Rather, as stated

---

[17] Stockham's laudatory opinion was not without caveats. He testified that annual certification for dogs was preferable and that some of the dogs' training records were not as diligently kept as he would have preferred, although he was not specific about which dogs' records he found deficient in this respect. Additionally, Stockham stated that although the trailing dogs had performed "fine" during their training on negative trails, he would have done more of that type of training with them.

above, he takes issue with the specific application of certain parts of the court's analysis, particularly the court's refusal to require physical or forensic "corroboration" as a condition for admitting testimony concerning the cadaver and trailing dog alerts. In this section, we set forth the court's exemplary analysis regarding the admissibility of that evidence under § 907.02 and *Daubert*. In the next section, we address Bucki's legal argument regarding corroboration of canine scent evidence.

¶45 The circuit court first concluded the introduction at trial of the canine scent evidence would require expert testimony, and it therefore correctly determined it needed to proceed under the WIS. STAT. § 907.02 analysis set forth above.[18] The court determined the State, as the proponent of the evidence, would bear the burden of proving its admissibility by a preponderance of the evidence. *See Seifert v. Balink*, 2017 WI 2, ¶58, 372 Wis. 2d 525, 888 N.W.2d 816 (plurality opinion).

¶46 Proceeding under the WIS. STAT. § 907.02 framework, the circuit court addressed the threshold considerations that have long been attendant to expert testimony: whether the testimony would be relevant, helpful to the jury, and rendered by a qualified expert. *See State v. Going Places Travel Corp.*, 2015 WI App 42, ¶32, 362 Wis. 2d 414, 864 N.W.2d 885 (noting the pre-*Daubert* standards governing the admissibility of expert testimony encompassed relevancy, the witness's qualifications, and the helpfulness of the evidence). Additionally, the court considered whether the evidence should be otherwise excluded under WIS.

---

[18] It is important to note that Bucki does not dispute that the canine handlers' testimony involves "scientific, technical, or other specialized knowledge" under WIS. STAT. § 907.02.

STAT. § 904.03 on the basis that its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.[19]

¶47    As to relevance, the circuit court noted the broad definition of relevancy contained in WIS. STAT. § 904:01: "[E]vidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  The court determined the cadaver and trailing dog evidence was clearly relevant to the ultimate issue in the case, namely whether Bucki was the person who had stabbed Anita, strangled her, and concealed her body in a ditch.

¶48    The circuit court next considered whether the canine scent evidence, though relevant, should nonetheless be excluded under WIS. STAT. § 904.03.  The court discussed the defense's argument in this regard, which was that the danger of unfair prejudice was high because the general public believes such dogs are infallible, the dog alerts were unreliable, and evidence of the dog alerts could confuse the jury.  The court noted the general "unreliability" of evidence was not a ground for exclusion under § 904.03.  Furthermore, it observed that the defense had presented no evidence concerning public attitudes about the fallibility of scent dog alerts, nor was there any indication that the probative value of that evidence was substantially outweighed by concerns regarding unfair prejudice or confusion of the issues.

---

[19] The full text of WIS. STAT. § 904.03 states:  "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Bucki does not suggest that undue delay, waste of time, or needless presentation of cumulative evidence apply to the canine scent evidence here.

¶49 Then, the circuit court addressed whether the canine scent evidence would be helpful to the jury. Expert testimony is helpful if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." WIS. STAT. § 907.02. The court again noted that the ultimate issue was whether Bucki was the person who had murdered Anita and hid her body. It concluded that the dog alerts would assist the jury in determining whether Bucki was the perpetrator. The court acknowledged the defense's reliance on *People v. McPherson*, 271 N.W.2d 228 (Mich. Ct. App. 1978), which held, in the context of a sufficiency-of-the-evidence challenge to a criminal conviction for breaking and entering, that canine handler testimony regarding the activities of a tracking dog was not enough, standing alone, to sustain the conviction.[20] *Id.* at 230. The court concluded, however, that this rule would not justify the pretrial exclusion of the evidence, as the jury could "give whatever weight it deems appropriate" to the cadaver and trailing dog evidence.

¶50 The circuit court next concluded that each of the canine handlers was sufficiently qualified to present expert testimony. The court analyzed each handler separately, discussing the person's employment history, the length of time he or she had been working with dogs, the extent of his or her training and experience in teaching dogs to detect particular scents, and the person's familiarity with the relevant literature and peer-reviewed studies. The court concluded that McGill, Frost, Horn and Disher were each qualified to testify as experts "by knowledge, skill, experience, training and/or education."

---

[20] Horn distinguished a tracking dog from a trailing dog in her testimony. According to Horn, "[t]racking is a footstep to footstep type scenario … where the dog is working off the crushed vegetation, usually a fresher scent. A trailing dog will take that scent and what is produced is a scent [cone] …. [T]he bloodhound will work that scent cone and continue it in the direction of the track layer." Many cases discuss canine tracking activities as opposed to canine trailing activities, but, for our purposes, this distinction is immaterial.

¶51    Next, the circuit court engaged in the more rigorous scrutiny of the handlers' testimony required by WIS. STAT. § 907.02 and *Daubert*.    It first considered whether the dog handlers' testimony was based upon "sufficient facts or data," one of the § 907.02 criteria on which Bucki bases his corroboration argument on appeal.    The court noted the total amount of time each handler was present at the relevant scene, and it relied on detailed incident reports authored by McGill, Frost, Disher and Horn describing their canine investigations during the relevant time periods.    The reports included a variety of information, including descriptions of the dogs' training, the handlers' experience, the locations the dogs investigated, the methodology of those investigations, and environmental conditions on the relevant date.[21]    The court concluded that each handler's proposed testimony was based on sufficient facts or data.

¶52    The circuit court also determined the handlers' testimony was based upon reliable principles or methods.    The court gave explicit consideration to seven factors discussed in *Daubert* and the advisory committee notes to the analogous federal rule of evidence.    *See Daubert*, 509 U.S. at 593-94; FED. R. EVID. 702

---

[21] In some cases, the canines were present at the respective scenes for hours, and they performed many more activities than are necessary to discuss in this opinion. We do not endeavor to set forth a more detailed discussion of the investigators' activities, as Bucki's primary argument under the "sufficient facts or data" prong is a legal one—i.e., that the evidence was inadmissible unless sufficiently corroborated by physical evidence.

advisory committee note to 2000 amendment.[22]  Those factors the court found applicable, and its conclusions regarding them, are as follows:

- Whether the expert's technique or theory can or has been tested.  The circuit court found that the relevant testing of the cadaver and trailing dogs occurred during their training, and it relied on the training records submitted by the dogs' handlers to demonstrate that each dog had been so trained.  The court concluded that training was based on scientific principles that had themselves been tested in controlled studies.

- Whether the technique or theory has been subject to peer review and publication.  The circuit court found that the technique and theory pertaining to both the cadaver dogs and the trailing dogs had been peer reviewed and published, again specifically citing the studies discussed by the witnesses during their testimony.

- The known or potential rate of error of the technique or theory when applied.  The circuit court observed that there was "clearly … an error rate" regarding the canine scent evidence.  It noted the error rates established by the published studies, and it concluded that the cadaver and trailing dogs here had an error rate that could be calculated based upon their training records.[23]

- Whether the technique or theory has been generally accepted in the scientific or other expert community.  Addressing the cadaver dogs first, the circuit court observed that there was a general acceptance that a properly trained dog can detect the odor of human remains.  The

---

[22] As the Supreme Court noted in ***Daubert v. Merrell Dow Pharmaceuticals, Inc.***, 509 U.S. 579, 595 (1993), the test under FED. R. EVID. 702 is a "flexible" one.  The federal advisory committee observed that no attempt had been made to codify all the factors that a court might consider when determining the admissibility of evidence subject to that rule, but its note sets forth numerous factors that had previously been deemed relevant.  A circuit court enjoys the broad latitude to decide how to determine reliability, and it may consider some, all, or none of the factors identified by ***Daubert*** and the federal advisory committee to determine whether expert evidence is reliable.  ***Seifert v. Balink***, 2017 WI 2, ¶64, 372 Wis. 2d 525, 888 N.W.2d 816 (plurality opinion) (citing ***Kumho Tire Co. v. Carmichael***, 526 U.S. 137, 142 (1999)).

[23] Although the circuit court did not reach any conclusion about the error rate of the specific canines used here, there is nothing in the record to suggest the dogs were so deficient in training that they were unreliable as a matter of law.  Additionally, the court did note the error rate of the studies, which are arguably more informative when considering the "reliable principles and methods" factor.

court noted that Dr. Myers disagreed there was a general consensus on certain aspects of a canine's ability, but that Stockham offered conflicting testimony on these points. As further support for its conclusion, the court noted that five states had found cadaver dog evidence admissible. As to the trailing dogs, the court also concluded that there was a general acceptance of the technique and theory, observing that thirty-eight states and the District of Columbia had deemed such evidence admissible.

- <u>Whether the technique or theory grew naturally and directly out of research conducted independent of litigation, or whether the expert opinions were developed expressly for purposes of testifying.</u> The circuit court found that cadaver dogs had been used to recover bodies from natural disasters and terrorist attacks, and that trailing dogs were commonly used to locate missing persons. Accordingly, the court determined the techniques and theories were not developed solely for use in litigation.

- <u>Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.</u> The circuit court concluded that while the reliability of the dog alerts could be challenged at trial, the handlers had not drawn unfounded conclusions based upon the principles to which they testified. In so concluding, the court noted that the cadaver dog handlers were not testifying that Anita's body specifically was present at the Bucki residence. The trailing dog handlers, too, testified only that the dogs detected the scent from each of the shoes they had been given, and that any statements that the scent was Bucki's was based on the representations that had been made to them by the officers present.

- <u>Whether the expert has adequately accounted for obvious alternative explanations.</u> The circuit court determined that the cadaver dog handlers had accounted for possible alternative explanations for the dog alerts, noting testimony that water runoff from areas where bodies were buried could cause a cadaver dog to alert where a body had not been physically present. The court determined, however, that the trailing dog handlers had not accounted for obvious alternative explanations, noting that as of the ***Daubert*** hearing, it had not been established whose scent was on the tennis shoes and there was the possibility of mixed scents due to different people wearing the tennis shoes.

Considering these seven factors in their totality, the court found that the principles and methods used by both the cadaver and trailing dog handlers were sufficiently reliable.

¶53    Finally, the circuit court considered whether the canine handlers had applied the principles and methods reliably to the facts of the case. Based upon the same detailed incident reports the court had referred to during its "sufficient facts or data" analysis, the court concluded the principles and methods discussed by the handlers had been reliably applied. Accordingly, the court granted the State's motion to admit the evidence and denied Bucki's motion in limine.

*C. Bucki's Proposed Corroboration Requirement*

¶54    Despite the circuit court's thorough analysis, Bucki contends the court erroneously exercised its discretion in a variety of ways by deeming the canine scent evidence admissible. First, he appears to contend, as a general matter, that some form of corroboration is required to admit expert evidence on canine scent in all cases, framing this requirement as a function of WIS. STAT. § 907.02's "sufficient facts or data" component. In addition to this categorical argument, he appears to argue the court erroneously exercised its discretion by not requiring corroboration under the specific facts of this case. We reject both Bucki's categorical argument and his fact-specific argument.

¶55    Bucki's argument for a categorical rule does not appear to go as far as some courts that have deemed canine scent evidence too unreliable to admit under any circumstances. *See, e.g.*, ***Myers v. Superintendent, Ind. State Prison***, 410 F. Supp. 3d 958, 1000-04 (S.D. Ind. 2019) (predicting, as a matter of state law, that bloodhound tracking evidence, which had been inadmissible in Indiana prior to the adoption of the Indiana Rules of Evidence, would remain so); ***People v. Cruz***, 643

28

N.E.2d 636, 662 (Ill. 1994) (reaffirming blanket exclusion on bloodhound evidence to establish any factual proposition in a criminal proceeding).

¶56    Although Bucki does not endorse this restrictive view, he seemingly proposes a categorical rule of his own:  In all cases in which canine scent evidence is sought to be used, the admissibility of the evidence is contingent upon the proponent proving that the canine alerts were corroborated in some fashion.  Bucki argues that such a rule is a foundational criterion for the admission of such evidence, and it is in keeping with foundation requirements set forth by the majority of states.  It is undisputed that no precedential Wisconsin case has yet addressed the admissibility of expert testimony concerning cadaver or trailing dog alerts.

¶57    The parameters of the corroboration rule Bucki proposes are somewhat unclear.  He suggests "physical or forensic" evidence is necessary to establish the reliability of the canine alerts.[24]  But beyond this generic description, Bucki does not provide much guidance despite his seeking to set a "floor" for the admission of canine scent evidence in the form of corroboration.

¶58    Even if "physical or forensic" corroboration was a sufficient description of his proposed rule, the presence of such corroborative evidence would render the canine scent evidence largely superfluous.  If the State could present physical or forensic evidence, it likely would do so and avoid the complexity of the *Daubert* inquiry for canine scent evidence altogether.  For example, at the ***Daubert***

---

[24] We note that corroboration can take different forms.  For example, in *People v. Lane*, 862 N.W.2d 446 (Mich. Ct. App. 2014), the court rejected the defendant's argument that cadaver dog evidence was unreliable and ought to be excluded because there was no chemical evidence of decomposition to support the dog's alert.  *Id.* at 457.  The court determined, however, that cadaver dog evidence is sufficiently reliable under *Daubert* if circumstantial evidence corroborates the dog's identification.  *Lane*, 862 N.W.2d at 457.  Bucki does not argue corroboration by circumstantial evidence is or should be required, so we do not address that issue.

hearing, Bucki suggested the State was required to establish that Anita's body had been present at Bucki's residence by showing that police had recovered her hair or blood from the areas where the cadaver dogs alerted. He also proposed that the State would need to present physical evidence showing that Bucki had been present at the location where Anita's body had been found. But if the State had this type of physical or forensic evidence linking Anita's body to Bucki's residence, or linking Bucki to the location where her body was found, it would surely use that evidence and either forgo the significant effort required to admit expert testimony about the dog alerts, or use that testimony merely to buttress the forensic findings. *Cf.* ***United States v. Funds in Amount of $100,120.00***, 730 F.3d 711, 720 n.9 (7th Cir. 2013) (observing that chemical testing of currency suspected in narcotics transaction would have obviated the need for the government to rely on a canine alert to the scent of narcotics).

¶59     As might be evident from the foregoing, Bucki's assertion that the admissibility of the canine scent evidence is contingent upon corroboration turns ***Daubert*** and WIS. STAT. § 907.02 on their heads. "The objective of [***Daubert***'s gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony." ***Kumho Tire Co. v. Carmichael***, 526 U.S. 137, 152 (1999). The focus is not on the expert's conclusion, which courts (oftentimes lacking expertise in the specific subject matter) are generally not competent to accept or reject out of hand. *See* ***Giese***, 356 Wis. 2d 796, ¶18. Rather, courts are required to focus on the principles and methodology on which the expert relies to ensure that those principles and methods have a reliable foundation in the expert's discipline. ***State v. Smith***, 2016 WI App 8, ¶5, 366 Wis. 2d 613, 874 N.W.2d 610 (2015). The type of corroboration requirement that Bucki proposes would test the reliability of the expert's principles and methodology only in the sense that the corroborating

30

evidence confirms the expert's conclusion. This approach improperly shifts the focus of the inquiry not to whether the expert's methodology was sound, but to whether the expert's opinion was *correct*.

¶60    None of the authorities on which Bucki relies compel us to accept corroboration of dog scent evidence as a condition of its admissibility.[25]    He primarily relies on a trio of foreign-jurisdiction cases: *People v. Gonzales*, 267 Cal. Rptr. 138 (Ct. App. 1990); *McPherson*; and *State v. Loucks*, 656 P.2d 480 (Wash. 1983) (en banc).    Those cases, however, were sufficiency-of-the-evidence challenges to convictions that were obtained solely based upon evidence of canine activity.   *See Gonzales*, 267 Cal. Rptr. at 140-44; *McPherson*, 271 N.W.2d at 343-47; *Loucks*, 656 P.2d at 482.   In those cases, the corroboration required was other evidence of guilt necessary to sustain a conviction; the cases did not speak to any corroboration necessary to establish the admissibility of the canine scent evidence in the first instance.   The *Gonzales* court framed the distinction between it and our case nicely: "It is not a question of trustworthiness, it is a question of substantiality—while the evidence might be trustworthy, we are not willing to rest our verdict on that evidence alone."   *Gonzales*, 267 Cal. Rptr. at 144; *accord McDuffie v. State*, 482 N.W.2d 234, 237 (Minn. Ct. App. 1992) (holding that dog-tracking evidence, while admissible if a proper foundation is established, is insufficient standing alone to support a criminal conviction).

---

[25]  Additionally, we question the talismanic significance Bucki assigns to the notion of "corroboration."  As Bucki's own expert testified, corroboration is "valuable but it doesn't show the reliability."  This observation is consistent with our holding here that corroboration may be considered by the circuit court in determining whether to admit evidence in a particular case, but it is not necessarily determinative of reliability.

¶61    In fact, contrary to Bucki's argument, the court in each case made clear that the canine evidence at issue was admissible at trial if certain foundational elements were met.  *See Gonzales*, 267 Cal. Rptr. at 144 (noting that under prior case law, canine evidence that met stringent foundational requirements was admissible); *McPherson*, 271 N.W.2d at 229 ("We accept the premise that tracking dog evidence is admissible in Michigan.")[26]; *Loucks*, 656 P.2d at 481-82 (holding that dog tracking evidence "should be admissible where a proper foundation is made showing the qualifications of dog and handler").  In many jurisdictions, the proper foundation for canine tracking evidence—which is similar, but not identical, to trailing dog evidence—requires a showing that: (1) the handler was qualified by training and experience to use the dog; (2) the dog was adequately trained to track humans; (3) the dog has been found to be reliable in the field; (4) the dog was placed on the track where the circumstances indicate the guilty party has been present; and (5) the trail has not become so stale or contaminated as to be beyond the dog's capability to follow.  *People v. Jackson*, 376 P.3d 528, 569 (Cal. 2016); *Loucks*, 656 P.2d at 481-82; *see also State v. Wilson*, 429 A.2d 931, 935 (Conn. 1980) (identifying jurisdictions with similar admissibility criteria); *People v. Lane*, 862 N.W.2d 446, 457 (Mich. Ct. App. 2014) (holding the foundational components for tracking dog evidence are also applicable to cadaver dog evidence).  These types of considerations are fair game under WIS. STAT. § 907.02, which authorizes a probing

---

[26] Despite Bucki's reliance on *People v. McPherson*, 271 N.W.2d 228 (Mich. Ct. App. 1978), we note that Michigan, which is a *Daubert* jurisdiction, is one of the few jurisdictions to have addressed cadaver dog evidence.  In *Lane*, the court rejected the defendant's argument that cadaver dog evidence should be excluded as unreliable "because chemical evidence cannot corroborate whether there was decomposition at the location." *Lane*, 862 N.W.2d at 457.  We recognize the type of corroboration Bucki proposes in this case is of a different nature than chemical corroboration, but the court in *Lane* held that "cadaver dog evidence is not significantly different from other forms of tracking dog evidence.  Tracking dogs and cadaver dogs both use a precise sense of smell to identify scents that are outside the range of human ability to detect." *Id.*

search for reliability while also affording the circuit court discretion in how it weighs the various factors.

¶62 On this point, we are mindful that WIS. STAT. § 907.02 sets forth a general framework through which circuit courts across the state may assess the reliability of a variety of expert opinions. There are many different types of experts, and many different types of expertise. *Kumho Tire*, 526 U.S. at 150. Accordingly, the law grants a circuit court "the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142. We do not preclude the possibility that a circuit court might require corroboration when determining the admissibility of canine scent evidence in a particular case, based upon the court's assessment of the relevant circumstances (which might include the handler's training and experience, the dog's past performance, and the nature of the investigation). But Bucki has not provided any basis to deem this particular type of evidence unreliable as a general matter absent corroboration. In any event, the *Daubert* factors essentially accomplish what a corroboration requirement seeks in terms of reliability.

¶63 Turning to Bucki's fact-specific argument, he asserts that even if *Daubert* does not require corroboration of the canine scent evidence as a general matter, in this case it was an erroneous exercise of discretion for the circuit court not to apply such a requirement. Bucki again argues the absence of corroboration was an appropriate consideration under the "sufficient facts or data" component of WIS. STAT. § 907.02, and he appears to argue the court's refusal to require corroborating evidence in this case was in contravention of the "broad latitude" given to trial courts, as noted in *Kumho Tire*. Bucki also challenges the court's determination that the canine scent evidence should not be excluded for any of the reasons identified in WIS. STAT. § 904.03.

¶64 Again, we do not quarrel with the notion that, based on the particular circumstances of a case, a circuit court has the discretion to require a showing of corroborative evidence before admitting canine scent evidence. But the decision to do so in a given case is highly fact-specific and turns on the court's assessment of the totality of the factors identified by WIS. STAT. § 907.02. The same is true of the circuit court's discretionary decision to exclude evidence under WIS. STAT. § 904.03. We now turn to the deficiencies Bucki alleges occurred here, which he asserts required the court to reject the canine scent evidence used in this case absent corroboration.

¶65 First—in what appears to be more akin to a general attack on the reliability of canine scent evidence—Bucki argues it is significant that the evidence was to be admitted to determine his guilt. Citing *Florida v. Harris*, 568 U.S. 237 (2013), Bucki acknowledges that "dog sniff" evidence is commonly admitted into evidence to establish probable cause in narcotics investigations. He argues, however, that because cadaver and trailing dogs were used in this case not to establish a "fair probability" that contraband was present, *see Harris*, 568 U.S. at 244, but rather as evidence tending to establish his ultimate guilt, it was necessary for the State to do "something more" to demonstrate the reliability of the handlers' opinions. The idea is apparently that a particular type of evidence might be sufficiently reliable to establish probable cause, but is not reliable enough for the jury to consider in determining guilt or innocence. *See State v. Fischer*, 2008 WI App 152, ¶13, 314 Wis. 2d 324, 761 N.W.2d 7, *aff'd on other grounds*, 2010 WI 6,

322 Wis. 2d 265, 778 N.W.2d 629 (concerning the results of preliminary breath tests, which are generally inadmissible at trial by statute).[27]

¶66    While Bucki is correct that the probable cause necessary to justify a search is a different standard than the burden of proof necessary to convict a defendant of a crime, this is a distinction without a difference as it pertains to the admissibility of expert testimony at trial.  A circuit court is generally not required to apply the rules of evidence at a hearing to determine whether to admit evidence at trial.  WIS. STAT. § 901.04(1).  Expert testimony at trial, though, must comport with WIS. STAT. § 907.02, which requires an evaluation of the reliability of the evidence.  Again, many of the jurisdictions that foreclose a conviction based solely on canine evidence do not go so far as to hold that such evidence is inherently unreliable and per se inadmissible at trial.  We perceive no basis to impose a corroboration requirement for the canine scent evidence here based upon the different inquiries and corresponding burdens of proof that might attach during the various phases of the criminal process.

¶67    Second, Bucki argues that because it is generally undisputed that the cadaver and trailing dogs used here are not infallible and there were opportunities for error to have crept into the canine investigations, the circuit court had no choice but to exclude the evidence as a matter of law.  Bucki argues this result obtains under both WIS. STAT. § 907.02—because there was no physical or forensic evidence corroborating the canine scent evidence—and under WIS. STAT.

---

[27]    The legislature has deemed the results of a preliminary breath test inadmissible in any action or proceeding (including trial) except to show probable cause for an arrest or to prove that a chemical test was properly required or requested.  *See* WIS. STAT. § 343.303.  The legislature has not made any similar declaration regarding canine scent evidence.

§ 904.03—because these deficiencies reduced the evidence's probative value to the point where it was "substantially outweighed" by the danger of unfair prejudice.

¶68     As it pertains to the cadaver dogs, Bucki argues the alerts were unreliable because the dogs detect only general human decomposition (not the scent from a specific individual), one dog did not alert to Bucki's truck bed, Izzy's alert at the area of disturbed earth could possibly be explained by the scent of human decomposition in water moving through the area, and Bucki believes ATV tracks near the area of disturbed earth were made by law enforcement vehicles and not his ATV.  Similarly, Bucki contends the trailing dog alerts were unreliable because there existed a possibility that Anita's scent was commingled with Bucki's scent on the tennis shoes used during the investigation.

¶69     None of the foregoing persuades us that the circuit court erroneously exercised its discretion when it deemed the canine scent evidence admissible. *Daubert* and WIS. STAT. § 907.02 do not condition the admissibility of expert opinion testimony on it being unassailable.  Several of the factors that may be considered under the statute—including the known or potential error rate and whether the expert has accounted for obvious alternative explanations—clearly establish that something less than one-hundred percent accuracy is acceptable. Where that line is to be drawn is for the circuit court to decide in the exercise of its discretion after considering all the relevant factors.  As the court here recognized, once a court has made the threshold reliability finding necessary to admit the expert opinion evidence, any deficiencies in the theory, methodology or application can be explored on cross-examination, and the jury can then give the opinion whatever weight it deems appropriate.

¶70    Similarly, we conclude the circuit court did not erroneously exercise its discretion when it refused to exclude the canine scent evidence under WIS. STAT. § 904.03.  Bucki proceeds from a faulty premise in asserting that an expert opinion with potential deficiencies in its theory or application must be excluded under that statute.  Determining whether to apply § 904.03 necessarily requires the court to ascertain the probative value of the evidence and weigh it against the potential for unfair prejudice or the other grounds for exclusion identified by the statute.  The court may use the determinations it made during the *Daubert*/WIS. STAT. § 907.02 inquiry to gauge the probative value of the evidence and to weigh that value against the attendant risks of admission.[28]  In this case, we cannot declare, as a matter of law, that the court was wrong in its balancing of these considerations merely because there were some arguable deficiencies in the principles or methodology relied upon by the experts.

¶71    As support for his assertion that the canine scent evidence here was too unreliable to be admitted, Bucki cites *Brooks v. People*, 975 P.2d 1105 (Colo. 1999) (en banc).  In *Brooks*, the Supreme Court of Colorado adopted the rule of the majority of states regarding the foundation necessary to admit canine tracking evidence, but it also adopted a corroboration requirement.  *Id.* at 1114-115.  In Colorado, though, expert testimony receives less rigorous scrutiny for reliability than it does in Wisconsin; under the relevant rule of evidence there, an expert

---

[28] *United States v. Funds in Amount of $100,120.00*, 730 F.3d 711 (7th Cir. 2013), tells a cautionary tale about imposing a one-size-fits-all approach to the type of evidence at issue here. In one case, the Seventh Circuit had declared that a narcotics-detection dog sniff of currency held minimal probative value, adopting a theory known as "currency contamination." *Id.* at 719 (citation omitted).  In a second, subsequent case, the Seventh Circuit cut back on that holding, concluding that the empirical information that had been submitted in connection with the second case showed such dog sniffs did pack an evidentiary punch. *Id.* at 719-20.  Based on the second case, a district court concluded that a defendant in a third case could not attack the probative value of the dog sniff evidence there, prompting the Seventh Circuit to remark that assessments of the weight to which a particular piece of evidence is entitled must be undertaken on a case-by-case basis. *Id.*

opinion is admissible as a general matter as long as it would be helpful to the jury and the expert is qualified to opine on the subject matter. *See id.* at 1109.

¶72    Because the Supreme Court of Colorado did not consider the canine evidence in *Brooks* to be sufficiently "scientific," it declined to apply either the *Daubert* standard for admissibility or the more permissive "general acceptance" test of its predecessor, *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). *Brooks*, 975 P.2d at 1111-114.[29] The adoption in Colorado of the foundational requirements identified in other cases represented a compromise position that found at least some footing in the Colorado rules of evidence, which liberally allowed expert testimony but, like Wisconsin, permitted the exclusion of any evidence whose probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See id.* at 1114; *see also* WIS. STAT. § 904.03. The court's adoption of the corroboration requirement in *Brooks* was part of its determination that substantial prejudice could attend the liberal admission of canine scent evidence if only the expert witness criteria of that state—i.e., a qualified witness and helpful testimony—were required.

¶73    Again, although we decline to require corroboration as a threshold criterion for the admissibility of dog scent evidence, we stress that the inquiries under WIS. STAT. §§ 907.02 and 904.03 are interrelated. In that sense, the *Brooks* court was correct: deficiencies in the principles underlying the expert's opinion, the expert's methodology, or the expert's application of those principles to the facts, although insufficient to eliminate the evidence under § 907.02, might nonetheless

---

[29] The Supreme Court of Colorado subsequently adopted expert witness standards consistent with *Daubert*. *See People v. Shreck*, 22 P.3d 68, 77-78 (Colo. 2001).

cause the evidence to have such low probative value that the risk of harm in admitting the evidence warrants its exclusion under § 904.03. But this is a discretionary call for the circuit court, and here we cannot say the court erroneously exercised its discretion based upon the possible flaws Bucki raises.[30]

¶74    Bucki also argues that if there is no corroboration requirement for the canine scent evidence under WIS. STAT. § 907.02, the evidence can be admissible only if it is subject to a higher burden of proof than a "preponderance of the evidence," which is the burden the proponent bears to show the reliability of expert opinions. *See Seifert*, 372 Wis. 2d 525, ¶58 (plurality opinion). Bucki does not dispute that he failed to make this argument to the circuit court, and we typically will not address issues that are raised for the first time on appeal. *See State v. Reese*, 2014 WI App 27, ¶14 n.2, 353 Wis. 2d 266, 844 N.W.2d 396.

¶75    In his reply brief, Bucki presents a litany of reasons why his burden-of-proof argument should not be subject to the forfeiture rule. In our view, none of the reasons he presents sufficiently overcome the purposes of the forfeiture rule, which are to prevent litigants from recalibrating their unsuccessful trial strategies on appeal and to avoid blindsiding circuit courts with reversals based on new theories. *See State v. Rogers*, 196 Wis. 2d 817, 827, 539 N.W.2d 897 (Ct. App. 1995). We therefore apply the rule here.

---

[30] Bucki argues that *State v. Chitwood*, 2016 WI App 36, 369 Wis. 2d 132, 879 N.W.2d 786, paved the way for his corroboration argument here by adopting such a requirement for the admission of the results of a Drug Recognition Evaluation (DRE), which is a standardized protocol for identifying drug intoxication. *See id.*, ¶31. The problem with that argument is the paragraph Bucki cites as establishing this corroboration requirement does no such thing. *See id.*, ¶45. We merely noted it was "undisputed" that the DRE was reliable, and in that case its reliability had been confirmed by the presence of certain drugs in the toxicology report. *Id.*

¶76    Finally, Bucki, in passing, suggests the circuit court erred by "substantially rejecting the defense special jury instruction, which proposed [that] the jury consider the lack of corroboration in evaluating the canine evidence."  As we have explained, corroboration was not required for the evidence to be admissible.  That being so, the court did not err by refusing to specifically call attention to the supposed lack of corroboration as part of the jury instructions.

¶77    The decision to give or not to give a requested jury instruction generally lies within the circuit court's discretion.  *State v. Hubbard*, 2008 WI 92, ¶28, 313 Wis. 2d 1, 752 N.W.2d 839.  Here, it appears the court gave at least part of the defense's proposed instruction, stating:

> Testimony of dog handlers—trailing and human remains detection has been presented in this case.  Such evidence must be considered in conjunction with all other evidence in this case.  In determining what weight to give such evidence, you should consider training, proficiency, experience, and proven ability, if any, of the dog, its trainer, and its handler, together with all the circumstances surrounding the trailing and searches in question.

This instruction appropriately advised the jury to determine what weight to give the canine scent evidence, based on factors bearing upon the reliability of the witnesses' opinions.  Because the instruction communicated a correct statement of the law, no grounds for reversal exist.  *Hubbard*, 313 Wis. 2d 1, ¶27.

*II.  Ineffective Assistance of Counsel*

¶78    Bucki argues he received ineffective assistance of trial counsel for three reasons.  First, he challenges his trial attorneys' failure to present Dr. Myers' testimony at trial to challenge the reliability of the canine scent evidence.  Second, and relatedly, he alleges his attorneys were constitutionally deficient for failing to

present evidence regarding potential contamination of the tennis shoes used during the trailing dog investigations. Third, Bucki asserts his attorneys should have done more to challenge the State's theory that the area of disturbed earth was an abandoned burial site for Anita's body. We reject each of these arguments.

¶79 We use the two-prong *Strickland* test to determine whether counsel was constitutionally ineffective. *State v. Reinwand*, 2019 WI 25, ¶40, 385 Wis. 2d 700, 924 N.W.2d 184; *see also Strickland v. Washington*, 466 U.S. 668, 687 (1984). A defendant must demonstrate both that counsel's performance was deficient and that the deficiency prejudiced the defense. *Reinwand*, 385 Wis. 2d 700, ¶¶40, 42.

¶80 The deficiency prong requires the defendant to prove "that the defendant's attorney 'made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.'" *State v. Starks*, 2013 WI 69, ¶54, 349 Wis. 2d 274, 833 N.W.2d 146 (quoting *Strickland*, 466 U.S. at 687). In determining whether counsel's performance was deficient, we make every effort to remove the distorting effects of hindsight, and we endeavor to reconstruct the circumstances and to evaluate the conduct from counsel's perspective at the time of the challenged conduct. *Reinwand*, 385 Wis. 2d 700, ¶41. We are highly deferential to counsel's strategic decisions made after a sufficient investigation, *id.*, and we presume that counsel's conduct falls within the wide range of reasonable professional assistance, *State v. Pico*, 2018 WI 66, ¶19, 382 Wis. 2d 273, 914 N.W.2d 95.

¶81 The prejudice prong requires a defendant to establish that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Reinwand*, 385 Wis. 2d 700, ¶42 (citing *Strickland*, 466

U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also* ***State v. Sholar***, 2018 WI 53, ¶33, 381 Wis. 2d 560, 912 N.W.2d 89. If the defendant fails to make a sufficient showing on one prong, it is unnecessary to address the other. *Reinwand*, 385 Wis. 2d 700, ¶43.

¶82 An ineffective assistance of counsel claim presents a mixed question of fact and law. ***State v. Ortiz-Mondragon***, 2015 WI 73, ¶30, 364 Wis. 2d 1, 866 N.W.2d 717. We will uphold a circuit court's findings of historical fact, including the circumstances of the case and counsel's conduct and strategy, unless they are clearly erroneous. *Id.* "Moreover, this court will not exclude the circuit court's articulated assessments of credibility and demeanor, unless they are clearly erroneous." *Id.* However, whether trial counsel rendered constitutionally ineffective assistance presents a question of law. *Id.*

### A. Failure to Present Dr. Myers' Testimony at Trial

¶83 Bucki contends that by failing to present Myers' testimony at trial, his defense team left "unchallenged [the] trial testimony of the four dog handlers." In Bucki's view, the canine scent evidence here was deficient in so many respects that his attorneys had no discretion but to call Myers to expose its abject unreliability. Bucki further argues his attorneys also unreasonably delegated to him the decision of whether to call Myers to testify.

¶84 Bucki largely fails to address his trial attorneys' testimony at the *Machner* hearing, upon which the circuit court based its conclusion that his attorneys were not deficient. The court found that decisions regarding trial strategy were made jointly by Bucki's two attorneys, Jessica Schuster and James Lex. The defense strategy was to emphasize the lack of physical evidence supporting the

42

notion that Bucki had killed Anita. The court found that Myers was prepared to testify if called as a witness and that Schuster had prepared her direct examination of Myers.

¶85 The trial was the second opportunity the defense had to cross-examine the State's canine handlers (the first being the *Daubert* hearing). The circuit court specifically found, based upon Schuster's and Lex's *Machner* hearing testimony, that the attorneys believed the cross-examination of the handlers at trial "went better" than the cross-examination at the *Daubert* hearing and that "they believed very good points were made" during the cross-examinations of the State's witnesses. The attorneys believed they were able to get certain testimony before the jury exposing weaknesses in the State's canine scent evidence without calling Myers.

¶86 Part of the defense's hesitation to call Myers was the attorneys' belief that he was "kind of a package deal" with agent Stockham, whom the defense presumed would be called as a rebuttal witness if Myers testified (as he had during the *Daubert* hearing). Lex, Schuster and Bucki discussed whether to call Myers at trial, and Bucki's attorneys gave him time in the evenings during trial to consider whether he wanted Myers to testify. Lex and Schuster told Bucki that they believed Stockham's testimony would have been detrimental to the defense in a way that exceeded any positive benefits from Myers' testimony. The circuit court found that, ultimately, Bucki agreed with his attorneys that Myers should not be called, although he did so "possibly reluctantly."

¶87    Bucki's argument on appeal primarily consists of identifying the ways in which Myers' testimony would have been helpful to his case.[31]   Yet, he has presented nothing to suggest that his attorneys' assessment of the adequacy of their cross-examinations of the dog handlers at trial was patently unreasonable.  As the State points out, many of the alleged deficiencies in the canine handler testimony were explored during cross-examination.[32]   The defense thoroughly explored these deficiencies during its closing argument, and it also highlighted that no physical evidence implicating Bucki was found in any area where the canines alerted.  As a result, we disagree with Bucki's assertion that the absence of Myers' testimony

---

[31]   In this area of Bucki's brief-in-chief, he generally omits record citations.  We remind counsel of the obligation to provide citations to the "parts of the record relied on" in the argument section.  *See* WIS. STAT. RULE 809.19(1)(e).  "We have no duty to scour the record to review arguments unaccompanied by adequate record citation." ***Roy v. St. Lukes Med. Ctr.***, 2007 WI App 218, ¶10 n.1, 305 Wis. 2d 658, 741 N.W.2d 256.

The lack of record citations is significant because Bucki appears to make claims unmoored to any specific testimony in the record.  For example, he states without record citation that "'[c]ueing' is … a reasonable explanation for the difference in canine responses to the pickup truck and, later, for Izzy's response to the 'shallow grave.'"  To the contrary, Myers agreed at the ***Daubert*** hearing that neither cadaver dog handler "knew the potential significance of any of the items located on the property; such as, the truck or an area that's been described as a shallow grave."  The absence of such knowledge seemingly undercuts Bucki's supposition that "cueing" was a valid alternative explanation.

[32]   As to the cadaver dog evidence, this exploration included eliciting McGill's admission that he did not know what Izzy alerted to other than the general scent of human decomposition; that he did not know which person the decomposition was from, how long ago it had been present, or how it got there; and that a dog alert did not mean that a body had been present.  McGill also admitted the scent of human decomposition might have arrived at the area of disturbed earth by water migration.  Frost made similar admissions during cross-examination.

As to the trailing dogs, both handlers admitted during cross-examination that they did not know what scent was present on the tennis shoes given to their dogs and that, if multiple people wore the shoes, it was possible the dog was tracking a different scent than Bucki's.  Additionally, Horn conceded it was "definitely" better to have a scent article that belonged to only one person.

caused a "complete inability" to challenge the reliability of the canine scent evidence.

¶88    Additionally, Bucki only minimally addresses the defense team's belief that Myers' testimony was relatively weak as compared to Stockham's testimony.  His only real argument on this point is that Stockham provided some testimony that was potentially helpful to the defense.[33]  Bucki fails to address his defense attorneys' concerns that Stockham's testimony would buttress the reliability of the canine scent evidence and that Stockham's testimony on that point would be more persuasive than Myers' testimony.  Schuster believed the jury would ascribe more weight to Stockham's testimony because he had knowledge and experience in training dogs, whereas Myers' testimony was based strictly on the scientific aspects of canine scent.  We agree with the circuit court's conclusion that, under the circumstances at the time of the decision, "the defense's strategy to not call Dr. Myers was objectively reasonable and [constituted] sound trial strategy."

¶89    Lastly, Bucki argues his defense team unreasonably delegated to him the task of deciding whether Myers should testify at trial.  The record does not support this assertion.  Bucki cites his own testimony that he was "flabbergasted"

---

[33] Bucki surmises that, had Stockham been called to testify at trial, he would have been forced to agree with Myers that the tennis shoes that had been used by the trailing dogs were contaminated.  This purported agreement between the experts is merely Bucki's supposition, as Stockham was not called to testify at the *Machner* hearing.  Instead, during the *Machner* hearing, Bucki represented to attorney Schuster that the transcript of the *Daubert* hearing showed that Stockham believed the tennis shoes were contaminated with other scents.  Bucki did not direct his counsel to any specific portion of the *Daubert* hearing transcript, and our review of the transcript does not reveal any point at which Stockham offered a definitive opinion that the tennis shoes had been contaminated in a way that rendered them unusable.  Rather, Stockham was asked a series of hypothetical questions about what might have happened in this case and the best practices for "safeguarding against contamination" (such as storing the scent article in a glass jar).  He testified that the records he reviewed suggested these "best practices" had not been followed in this case, but he did not further elaborate or offer an opinion that there was definitely scent contamination that destroyed the reliability of the trailing dog evidence.

by the suggestion that Myers would not testify. The circuit court, however, clearly accepted the testimony of Bucki's trial attorneys that it was a "group decision" not to call Myers, with his attorneys advising him of the advantages and disadvantages of Myers testifying and Bucki having the final say.

¶90    Notably, none of the cases Bucki cites in support of this argument compel the conclusion that Bucki's trial attorneys performed deficiently in taking this approach. Rather, the Supreme Court has "recognized that the accused has the ultimate authority to make certain fundamental decisions regarding the case." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). *Strickland* requires the defendant's counsel to advocate his or her cause and to "consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Strickland*, 466 U.S. at 688. What occurred here was within the permissible bounds of constitutionally effective representation.

### B. Failure to Adequately Present Evidence of Shoe Contamination

¶91    Next, Bucki "asserts the scent used was doomed, *a priori*, to be contaminated when the State negligently failed to employ an item of scent singular to the canine 'quarry,' such as clothing worn only by a defendant." He argues the tennis shoes used in the trailing dog investigations were "contaminated by the open presence of the tennis shoes in the Bucki household," as well as possible "scent transfer" from other articles seized from the Bucki household due to the "haphazard packaging" in which the shoes were placed. Bucki therefore argues the "jury should have heard about the proper procedures for evidence collection, transfer and storage," so that it could evaluate whether the shoes were cross-contaminated by Anita's scent.

46

¶92    Bucki does not explain who should have testified about those matters, what their testimony would have been, or why the jury was unable to evaluate the possibility of contamination based upon the evidence presented. That aside, Bucki's trial counsel elicited during Horn's cross-examination that it was possible for the scents of particular humans to be present on the same clothing article for several reasons, particularly if the individuals lived together. Horn admitted that she did not know whose scent was present on the shoe, and that if multiple people wore the shoe, it could affect her opinion as to the reliability of her dog's alert. Through this testimony, Bucki's trial counsel was able to highlight that the best scent evidence is obtained through the use of an article that is not contaminated by the scents of multiple individuals.

¶93    Bucki faults his trial attorneys for not doing more to establish at trial that it was possible Anita had at some point worn the tennis shoes used during the trailing investigation. At trial, during recross-examination, attorney Lex asked Clint whether his mother was "in the habit of slipping on whatever shoes were available?" The circuit court sustained an objection from the prosecution that this question was beyond the scope of the redirect questioning. Bucki contends his trial attorneys were deficient for failing to ask this question during cross-examination, rather than during recross.

¶94    As the circuit court recognized, a finding of deficient performance based upon Clint's anticipated testimony hinges on Bucki being able to demonstrate two things: (1) that Clint would testify he witnessed his mother wearing the tennis shoes; and (2) that Bucki's trial attorneys knew, or should have known, this information prior to trial. During the postconviction proceedings, Clint testified that in 2010, he saw his mother wearing the shoes when she went outside. Clint testified he was sure he told Bucki's trial attorneys about this memory prior to trial. Clint

conceded during cross-examination that the shoes were size twelve or thirteen, and his mother was approximately five feet tall and had relatively small feet.

¶95     Bucki's trial attorneys differed from Clint in their recollection of what Clint had told them. They testified they had asked Clint multiple times before trial whether he could testify that his mother had worn the tennis shoes, and Clint responded that he could not so testify. Bucki therefore questions why his attorneys would ask Clint about his mother wearing the shoes during recross-examination if they had no reason to believe he would testify that he had seen her wearing them. But Lex testified that during Clint's redirect examination, the attorneys spoke briefly and "decided to include it as an afterthought" on recross.

¶96     The circuit court found Bucki's attorneys more credible. Significantly, it relied on the affidavit Clint had filed in support of his father's postconviction motion, which did not include any averment that Clint had relayed information about his mother wearing the shoes in 2010 to Bucki's attorneys. Yet when Clint was asked during the *Machner* hearing whether he had put into that affidavit every piece of information he thought was important, he answered that he had.

¶97     The circuit court's credibility finding is dispositive on this issue. A circuit court's credibility finding is, in most cases, conclusive on appeal. *See Schultz v. Sykes*, 2001 WI App 255, ¶32, 248 Wis. 2d 746, 638 N.W.2d 604. The court's finding here means that Bucki's trial attorneys cannot be found deficient in this instance, as they had no reason to believe that Clint would be able to testify at trial that he had seen his mother wearing the shoes on one occasion. As a result, their failure to raise the issue on cross-examination was reasonable under the circumstances.

### C. *Failure to Challenge the Prosecution's "Shallow Grave" Theory*

¶98 Finally, Bucki asserts his trial attorneys were deficient for failing to do more to challenge the State's theory that the area of disturbed earth was an abandoned attempt to bury Anita. Nicholas Pendergast, a special agent with the Wisconsin Department of Justice, was present during the search of Bucki's property on April 30, 2013, and he testified at trial, in response to a juror's question, that the area surrounding the patch appeared to him not to have been driven on. In response to further questioning, Pendergast then testified that law enforcement "drove up towards [the area of disturbed earth] with our vehicles," but they had not operated the vehicles on the disturbed portion.

¶99 Bucki notes that when asked about the area of disturbed earth at the *Machner* hearing, Schuster testified that she believed the matter was a "red herring" and that it was "not really part of our defense because it didn't play into anything." Given Pendergast's testimony, Bucki suggests his attorneys should have further attacked the State's theory with photographs he was provided during a postconviction review, which, according to Bucki's *Machner* testimony, depict the "flat tracks" of a law enforcement utility terrain vehicle (UTV) as opposed to the "rounded tires" on Bucki's ATV. Bucki believes these photographs would have helped establish that he was not near the area of disturbed earth and, consequently, would have further undermined the reliability of Izzy's alert to the jury.

¶100 We conclude Bucki's trial attorneys were not deficient for failing to present the photographs. As the circuit court observed, Bucki has not offered any explanation for how the area of disturbed earth was created on his property, nor has he argued he provided his trial attorneys with any such explanation. His appellate argument rests solely on his belief that photographs show tracks from a law

enforcement vehicle and not his ATV.[34] Pendergast was assigned to the case on April 30, 2013, and the photographs to which he refers all appear to have been taken on that date. At the *Machner* hearing, two investigators involved in the search for Anita on the property on April 26th—and who had operated the law enforcement UTV on that date—testified they did not operate it in the area of disturbed earth, nor did they see anyone else doing so. In all, the photographs do not undercut the notion that Bucki could have been present in the area of disturbed earth during the relevant time period.

¶101 Moreover, we note that Bucki's trial attorneys successfully pursued a motion in limine to prohibit the State's witnesses from referring to the area as a "shallow grave." The State was not precluded from arguing in closing that the area was of a size and type consistent with an attempt to use as a grave. But the defense highlighted that there was no incriminating physical evidence found in that area, and Bucki's trial attorneys were able to elicit testimony suggesting that Izzy's alert could have been caused by water migration carrying the scent of human decomposition from another area. On this record, we cannot find deficient performance in failing to do more to challenge the State's theory.

*By the Court.*—Judgment and order affirmed.

---

[34] The State on appeal disputes that the photographs depict flat tracks, but it apparently did not seek to introduce testimony to that effect at the *Machner* hearing.