COURT OF APPEALS
DECISION
DATED AND FILED

June 21, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2021AP726-CR**

STATE OF WISCONSIN

Cir. Ct. No.  2019CF244

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

 V.

JOHN H. BAYERL,

  DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Waukesha County:  BRAD SCHIMEL, Judge.  *Affirmed*.

Before Gundrum, P.J., Neubauer and Grogan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. John H. Bayerl appeals a judgment of conviction for first-degree intentional homicide in connection with the 1979 disappearance of his wife, Dona. He also appeals an order denying his postconviction motion. On appeal, Bayerl argues the circuit court erroneously exercised its discretion by admitting other-acts evidence generally consisting of testimony from former wives about his alcohol use and verbal and physical abuse of them. He also argues he received constitutionally ineffective assistance from his trial attorney in various ways. Finally, he contends he is entitled to a new trial in the interest of justice. We reject his arguments and affirm.

## BACKGROUND

¶2 Bayerl's wife Dona disappeared in early May 1979 following an argument between them. Neither she, nor her body, has been found. Bayerl was charged with first-degree intentional homicide in connection with her death in early 2019.

¶3 At trial, there was testimony about the couple's deteriorating marriage and Bayerl's admitted physical abuse of Dona and his infidelity prior to Dona's disappearance. As described in more detail below, two of Bayerl's former wives, A.P. and L.B., testified that he often drank and was physically abusive toward them.

¶4 There was little physical evidence of a crime; the State's case was largely circumstantial.[1] Various witnesses testified that after Dona disappeared,

---

[1] We do not endeavor to set forth all of the evidence the State marshaled against Bayerl. Rather, we confine our recitation to those facts relevant to the issues he raises on appeal.

they saw what appeared to be blood on items in the garage and on the garage structure itself. Some of those items were submitted to the Wisconsin State Crime Laboratory for testing in 2018 and 2019. Two clothespins and one bottle tested positive for blood on a presumptive test, but confirmatory testing for blood was negative. Analysts were able to develop a partial female DNA profile from the substance on the bottle.[2] Dona's daughter provided law enforcement with one of her few possessions from her mother, a baby book that at one time had photographs inserted on pages using adhesive corners that became sticky when licked. A sample from one of the photograph corners yielded a DNA profile that was consistent with the substance on the bottle. The State's DNA analyst testified that statistically, the shared profile would be found in one person out of every twelve billion people tested.[3]

¶5    Bayerl filed a postconviction motion after the jury found him guilty of first-degree intentional homicide. He alleged various instances of ineffective assistance of counsel, and the circuit court held a *Machner* hearing[4] at which one of Bayerl's trial attorneys testified. The court denied Bayerl's postconviction motion, concluding that his trial counsel was not constitutionally ineffective and that Bayerl's conviction was based on "admissible and ultimately strong evidence" of his guilt. Bayerl now appeals.

---

[2] The substance on one of the clothes pins was of insufficient quantity to yield a useable profile. The sample from the other clothes pin was just barely sufficient to suggest the presence of female DNA.

[3] The analyst declined to identify the profiles as "an exact match," testifying that laboratory policy allowed such a conclusion only if the statistical probability met or exceeded 1,000 times the world's population.

[4] *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

## DISCUSSION

*I. Admissibility of Other-Acts Evidence*

¶6      The admissibility of other-acts evidence is governed by WIS. STAT. § 904.04 (2021-22)[5] and other generally applicable rules of evidence, such as WIS. STAT. §§ 904.01 and 904.03. **State v. Sullivan**, 216 Wis. 2d 768, 772-73, 576 N.W.2d 30 (1998). Using these statutes, **Sullivan** set forth a three-step framework for analyzing other-acts evidence, which is generally not admissible to establish a person's character in order to show that the person acted in conformity therewith. Sec. 904.04(2).

¶7      **Sullivan** requires that the proponent of the evidence first demonstrate that the evidence is offered for an acceptable purpose under § 904.04(2)—permissible purposes include proof of motive, intent, identity, or absence of mistake or accident. The proponent must then establish the two facets of relevance under WIS. STAT. § 904.01. If the proponent satisfies those requirements, the burden shifts to the opposing party to demonstrate that the evidence should be excluded because its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or other considerations under WIS. STAT. § 904.03.

¶8      A circuit court's evidentiary decisions are reviewed for an erroneous exercise of discretion. *See* **Sullivan**, 216 Wis. 2d at 780. We will uphold the court's determination if it examined the relevant facts, applied a proper standard of

---

[5] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

law, and used a demonstrated rational process to reach a reasonable conclusion. *Id.* at 781. We will search the record for reasons to sustain a circuit court's exercise of discretion. *State v. Salas Gayton*, 2016 WI 58, ¶20, 370 Wis. 2d 264, 882 N.W.2d 459.

¶9 Bayerl's primary appellate argument regarding the other-acts evidence is that the incidents testified to were too dissimilar to the first-degree intentional homicide charged here. *See id.* at 786. This argument permeates through each step of Bayerl's *Sullivan* analysis; for example, Bayerl asserts that because the other acts involving A.P. merely featured bodily harm rather than homicide, they could not help establish his identity as Dona's killer, nor were they probative of any of the elements of first-degree murder. *See* WIS. STAT. § 940.01(1)(a) (defining first-degree intentional homicide).

¶10 The circuit court concluded evidence of Bayerl's abusive conduct toward his wives was admissible to prove "intent, absence of mistake, identity, [and] context or background." In doing so, the court noted that given the absence of a body and the largely circumstantial case against Bayerl, the similarities between the other acts and the homicide were difficult to assess. The court compared "what we know of the relationship between the Defendant and Dona" to the proffered other-acts evidence and determined that there were significant commonalities: aggressive behavior toward a spouse that was seemingly enhanced by alcohol use; a tendency to become enraged over relatively trivial home matters; and violent eruptions that occurred whenever the spouse attempted to leave the situation or get the last word.

¶11 We conclude the circuit court did not erroneously exercise its discretion when it admitted the challenged other-acts evidence. We begin with the

5

other-acts evidence regarding Bayerl's prior assaultive conduct toward Dona and his infidelity. The court concluded such evidence was proffered for the permissible purposes of proving the identity of the murderer, the absence of mistake regarding Dona's death, the existence of the requisite intent, and as context or background relating to her disappearance. "The state was entitled to show what had been the relations between defendant and his wife prior to the alleged uxor[i]cide."[6] ***Runge v. State***, 160 Wis. 8, 12-13, 128 N.W. 80 (1915). Such evidence was both relevant to and probative of the alleged homicide.

¶12 We also conclude the circuit court did not erroneously exercise its discretion when it admitted the evidence regarding A.P. and L.B. In analyzing the admissibility of this evidence, it is important to note that, by Bayerl's own account to authorities, he was in a bad marriage and a lengthy argument immediately preceded Dona's disappearance. Bayerl told a detective he had been drinking and Dona was doing most of the talking during the argument. Bayerl additionally told police that Dona said to him, "I can't live like this anymore or I will go crazy," and "I would be better off with a boyfriend." The State's theory at trial was that the argument had escalated into violence that ultimately ended with Dona's murder.

¶13 Placed in this context, the similarities between the physical abuse of A.P. and L.B. and Dona's alleged homicide become such that the circuit court could reasonably conclude the evidence satisfied ***Sullivan***. For example, as it relates to identity, "the other-acts evidence should have such a concurrence of

---

[6] Uxoricide is "the murder of a wife by her husband." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2526 (unabr. 1993)

common features and so many points of similarity with the crime charged that it 'can reasonably be said that the other acts and the present act constitute the imprint of the defendant.'" *State v. Kuntz*, 160 Wis. 2d 722, 746-47, 467 N.W.2d 531 (1991) (quoting *State v. Fishnick*, 127 Wis. 2d 247, 263-64, 378 N.W.2d 272 (1985)).

¶14    *Kuntz* is an instructive case for purposes of dissecting Bayerl's arguments.  There, at the defendant's trial for arson of an estranged spouse's residence and murder of her relative, other-acts evidence was admitted consisting of the testimony of another of Kuntz's ex-wives that Kuntz had, approximately sixteen years earlier, said he was going to set his first wife's house on fire.  *Id.* at 745.  Kuntz also told her after a brief separation that while she was gone he had made a bonfire out of her and her children's belongings.  *Id.*  Our supreme court concluded the circuit court properly exercised its discretion when admitting this evidence for the permissible purposes of proving identity and motive: "The circumstances in each instance were strikingly similar and the other-acts were not so remote to attenuate all rational or logical connection between the acts."  *Id.* at 748.

¶15    *Kuntz* is inconsistent with the logic Bayerl advances here.  After all, Kuntz had not *actually* committed a prior arson; he merely told his then-wife that he intended to do so.  And just as Bayerl distinguishes acts of physical abuse from murder, so too could our supreme court in *Kuntz* have held that burning household belongings out of anger was too far afield from setting fire to a home and shattering the occupant's skull.  *See id.* at 731-32.  But, consistent with *Kuntz*, we reject Bayerl's arguments and uphold the circuit court's reasonable determination that the A.P. and L.B. evidence was admissible for the purposes of identity,

absence of mistake or accident, and intent as it related to Dona's murder, and that the evidence was therefore relevant to the homicide prosecution.

¶16    While Bayerl stresses that his other acts did not result in a homicide, A.P.'s testimony suggested this lack of consequence was not a basis for materially distinguishing the acts themselves. A.P. testified that after she told Bayerl she wanted a divorce, he pushed her down a stairway and "was twisting his hands on my neck both ways, and I was afraid that he was going to choke me and that I might die." The assault terminated only when another person appeared in the hallway. We reject Bayerl's assertion that the other-acts evidence could have probative value only if it resulted in death.

¶17    L.B.'s testimony, too, suggested the possibility of serious physical harm and escalation. She testified that after Bayerl returned home from a bowling league, he began screaming at her during dinner for no apparent reason. When she left the table, Bayerl pursued her down a hallway with a "[look] like a wild animal." He punched her and slammed her into a wall. She retreated into a bedroom, where Bayerl ripped a telephone out of the wall when she tried to grab it. L.B. testified she was scared during Bayerl's physical assault and she stood on a bed to protect herself as best she could. Again, the circuit court could reasonably conclude there were sufficient commonalities between these circumstances and the alleged homicide.

¶18    Bayerl relies on *State v. Cartagena*, 99 Wis. 2d 657, 299 N.W.2d 872 (1981), for the proposition that the dissimilarity in the other acts here to the charged murder demonstrate an erroneous exercise of discretion. In that case, the state sought to admit evidence that the defendant had repeatedly fired a gun at a house in an effort to scare a person into paying back some money. *Id.* at 666. In

holding that evidence was inadmissible during a prosecution for attempted homicide, our supreme court emphasized that under the state's theory, the defendant was motivated by revenge for the victim being a "snitch." Thus, the proffered other-acts evidence and the charged crime showcased completely different motives. *Id.* at 669. The court held that "[e]vidence of the 'house shooting' is not probative of the defendant's intent to kill [the victim of the attempted homicide], nor is it probative of the motive that allegedly led him to form that intent." *Id.* As set forth above, we cannot reach a similar conclusion here.

¶19 Notably, we uphold the circuit court's exercise of discretion without reference to the greater latitude rule. *See* WIS. STAT. § 904.04(2)(b)1. Though the circuit court cited the greater latitude rule, Bayerl did not address its application in his brief-in-chief. After the State relied on the rule in its response brief, Bayerl for the first time in his reply brief argues that the rule violates the ex post facto clauses of the United States and Wisconsin constitutions.[7] Because we conclude the other-acts evidence was admissible without reference to the greater latitude rule, we have no need to address this argument. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (stating that if a decision on one point disposes of the appeal, then this court need not decide the other issues raised).

## II. Ineffective Assistance of Counsel

¶20 The Sixth Amendment guarantees a defendant the effective assistance of counsel. *State v. Savage*, 2020 WI 93, ¶27, 395 Wis. 2d 1, 951

---

[7] Typically, we do not address arguments raised for the first time in a reply brief. *Roy v. St. Lukes Med. Ctr.*, 2007 WI App 18, ¶30 n.6, 305 Wis. 2d 658, 741 N.W.2d 256.

N.W.2d 838. We review an ineffective assistance of counsel claim using a mixed standard of review. *Id.*, ¶25. The circuit court's factual findings, including those regarding trial counsel's conduct and strategy, will not be overturned unless they are clearly erroneous, but we review de novo whether counsel's conduct constitutes constitutionally ineffective assistance. *Id.*

¶21 To prevail on an ineffective assistance claim, the defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *Id.*; *see also* ***Strickland v. Washington***, 466 U.S. 668, 687 (1984). If the defendant fails to establish either prong, we need not address the other. ***Savage***, 395 Wis. 2d 1, ¶25.

¶22 To demonstrate deficient performance, the defendant must show that his or her attorney made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.*, ¶28. We presume that counsel's conduct fell within the wide range of reasonable professional assistance, and we will grant relief only upon a showing that counsel's performance was objectively unreasonable under the circumstances. *Id.* Prejudice is demonstrated by showing a reasonable probability that, but for counsel's unprofessional conduct, the result of the proceeding would have been different. *Id.*, ¶32.

*A. Expert Testimony Regarding Blood Testing*

¶23 Bayerl argues his trial counsel rendered constitutionally ineffective assistance by failing to exclude the blood evidence. At trial, Ronald Witucki testified that he peer-reviewed another DNA analyst's work regarding the Bayerl

10

case.[8] Presumptive testing indicated the presence of blood on two clothes pins and a bottle found in Bayerl's garage in May 1979, but confirmation testing was negative. At trial, Witucki explained that it was possible to receive a false positive on the presumptive test. He also testified that a negative confirmatory test did not conclusively establish that the substance was not blood; though that was one possibility, it was also possible that an insufficient amount of the sample had been used for the testing, or that the sample had suffered degradation or break down.

¶24    Bayerl argues Witucki's testimony was irrelevant and prejudicial under WIS. STAT. § 907.02 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). He argues Witucki's testimony regarding the confirmatory test was misleading because it "caus[ed] the jury to believe that there was scientific evidence supporting the State's theory that the tested items contained blood evidence." He also argues Witucki's testimony lacked reliability of both method and application. Essentially, Bayerl claims that Witucki offered, without any basis, an opinion that a substance that failed a confirmatory test could nonetheless be blood.

¶25    We conclude Bayerl's trial counsel did not perform deficiently by failing to do more to challenge Witucki's testimony. Witucki repeatedly recited the results of the presumptive and confirmatory testing. He did not definitively declare the substances found on the clothes pins and bottle to be blood. In fact, he declined to offer such an opinion when pressed, acknowledging the substances could be one of several bodily materials. A partial DNA profile had been

_____

[8] Witucki found the testing satisfactory and adopted the other analyst's conclusions as his own.

11

developed from one of the clothes pins, and Witucki testified that the presumptive test and the DNA profile gave a "strong indication" that the substance was human blood. That was as close as he came to offering an opinion about the composition of the samples, and it relied on additional testing beyond the presumptive test. *Daubert* provides a flexible way to assess an expert's methodology, *Seifert v. Balink*, 2017 WI 2, ¶114, 372 Wis. 2d 525, 888 N.W.2d 816, and Bayerl does not contend Witucki was unqualified to offer these opinions.

¶26     Nothing Bayerl has presented persuades us that Witucki's testimony was "ipse dixit" testimony lacking sufficient indicia of reliability or that Witucki extrapolated from an accepted premise to reach unfounded conclusions. To demonstrate that Witucki got it wrong, Bayerl provided during the postconviction proceedings a report from his retained expert Alan Friedman opining that "a negative confirmatory test should be reported that blood was not detected." But this conclusion is of little aid to Bayerl. As set forth above, Witucki's testimony was limited to reciting the test results; he did not opine that the substances were blood.

¶27     Bayerl seems to argue Witucki was competent to testify only with a definitive declaration that the substances were not blood. No such declaration was justified based on the information provided by Friedman, who addressed only the proper manner of communicating a negative confirmatory test result (i.e., "blood was not detected."). Bayerl's expert did not critique Witucki's methodology and, in fact, cited one study supporting Witucki's testimony that confirmatory testing may fail to detect decades-old old blood stains. Though the report also cited some literature to the contrary, "*Daubert* and WIS. STAT. § 907.02 do not condition the admissibility of expert opinion testimony on it being unassailable." *State v. Bucki*, 2020 WI App 43, ¶69, 393 Wis. 2d 434, 947 N.W.2d 152.

12

¶28    Bayerl also argues that Witucki's testimony comparing the DNA on the baby book and on the bottle was inadmissible as "pure guesswork and speculation." We agree with the State's assertion that our review of this issue was forfeited by Bayerl's failure to question his trial counsel about the matter. *See State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979). Moreover, further analysis is unnecessary given Bayerl's failure to do more than offer conclusory assertions. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

### B. Expert Rebuttal Testimony

¶29    Bayerl also argues that even if his trial attorney was not deficient for failing to exclude Witucki's testimony, he was deficient for failing to call Friedman as an expert witness to testify consistent with his report's conclusions. As explained above, Friedman's opinion regarding the proper manner of communicating a negative confirmatory test did little to rebut Witucki's testimony. At most, Friedman could have opined that there was not scientific consensus regarding the accuracy of confirmatory testing when the sample was decades old.

¶30    In analyzing this allegation of ineffective assistance, we note there was extensive testimony at the *Machner* hearing about whether Friedman would be called to testify at trial. Bayerl's counsel said that after the *Daubert* hearing, Friedman had "complimented the State's witness that they were forthright and honest and believed that he had nothing significant to add." Counsel and Friedman reached a mutual decision that Friedman would not testify, though the defense named him as a possible witness anyway.

13

¶31    After Witucki testified at trial, counsel considered calling Friedman, but the defense team decided that his testimony was unnecessary because they had sufficiently made the point through Witucki that the samples were not confirmed as blood. We will not second-guess trial counsel's strategic assessment. *See State v. Bailliette*, 2011 WI 79, ¶26, 336 Wis. 2d 358, 805 N.W.2d 334.

### *C. Lay Testimony Regarding Blood in Garage*

¶32    Next, Bayerl argues he received ineffective assistance as a result of his trial counsel's failure to exclude "lay opinion testimony about the same 'blood' in Bayerl's garage." Bayerl argues that when various lay witnesses testified that they saw blood, they were surreptitiously offering expert testimony prohibited by WIS. STAT. § 907.01.

¶33    The fundamental problem with this argument is that Bayerl's trial counsel successfully headed off this issue with a pretrial ruling that prohibited lay witnesses from saying a particular substance they saw was blood. Instead, the court required the State's witnesses to testify that what they saw appeared to be blood. Each of the witnesses Bayerl mentions complied with this directive, variously testifying that the substance they saw "looked like blood," "appeared to be blood," "appeared to be dried blood," and was "dark brown in color" and consistent with "blood splatter." We agree with the State that in reaching these conclusions, the witnesses could rely on their perceptions and experience. There is no basis on this record for concluding trial counsel was deficient in the handling of the lay testimony regarding blood.

### D. Hearsay Testimony

¶34    Bayerl next argues that there were a litany of evidentiary objections his trial attorney should have interposed at trial, primarily hearsay objections. We do not need to individually address these matters because Bayerl failed to preserve his trial attorney's testimony during the *Machner* hearing. Trial counsel was asked only generally whether there was a strategy for objecting if the State attempted to introduce hearsay evidence. Counsel responded that the defense team was "open to objecting if we felt that it was appropriate."

¶35    Bayerl argues this was sufficient questioning to preserve the multitude of specific hearsay and other objections he argues his trial counsel was constitutionally required to make. We disagree, as the general testimony reveals nothing about any strategic considerations that may have prompted counsel to forego a specific objection. *See Machner*, 92 Wis. 2d at 804 (observing that without testimony "w[e] cannot otherwise determine whether trial counsel's actions were the result of incompetence or deliberate trial strategies."). Absent questioning about the specific instances of alleged deficiency, we must presume that trial counsel acted within the constitutional parameters of representation. *See State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990).

¶36    Bayerl argues the lack of testimony is immaterial partially because the circuit court addressed many of the suggested objections when denying postconviction relief. But the circuit court conducted a lengthy review of the suggested objections and concluded that they were either meritless or their absence was not prejudicial under *Strickland*. On appeal, Bayerl merely offers general (and conclusory) assertions that the statements were hearsay or were otherwise objectionable, without engaging with the circuit court's reasoning to the

contrary. *See Pettit*, 171 Wis. 2d at 646. We perceive no error in the circuit court's rejection of these claims.

### E. Impermissible Vouching Testimony

¶37 Bayerl next asserts his trial counsel was constitutionally ineffective for failing to object to Dona's sister's testimony about whether she believed Bayerl's explanation of the events surrounding Dona's disappearance. Bayerl asserts this testimony violated *State v. Haseltine*, 120 Wis. 2d 92, 352 N.W.2d 673 (Ct. App. 1984), which held that "[n]o witness, expert or otherwise, should be permitted to give an opinion that another mentally and physically competent witness is telling the truth." *Id.* at 96.

¶38 Bayerl also failed to preserve his trial counsel's testimony on this issue, and we could affirm on that basis alone. Additionally, the State persuasively argues that this appears to be an unsettled area of the law under *State v. Smith*, 170 Wis. 2d 701, 490 N.W.2d 40 (Ct. App. 1992), and *State v. Snider*, 2003 WI App 172, 266 Wis. 2d 830, 668 N.W.2d 784, in which law enforcement officials testified they did not believe a suspect's explanation. Counsel is not constitutionally ineffective for failing to raise a novel legal issue. *State v. Lemberger*, 2017 WI 39, ¶18, 374 Wis. 2d 617, 893 N.W.2d 232.

¶39 On the merits, we are skeptical the testimony ran afoul of the *Haseltine* proscription given its nature. Dona's sister's testimony was not akin to the testimony in *Haseltine*, where a psychiatrist testified there was "no doubt whatsoever" that the defendant's daughter was an incest victim, *see Haseltine*, 120 Wis. 2d at 95-96. Dona's sister testified that she challenged Bayerl's explanation to her because it would have been out of character for her sister to go

16

out alone at night and leave her children. She also stated she did not believe Bayerl could hear a car turning around across the street from his bedroom.

### F. Character of Victim

¶40    Bayerl asserts his trial attorney performed deficiently by failing to object to testimony portraying Dona as a "peaceful and quiet stay-at-home wife who would never leave her house nor her children, and who did not have any money of her own nor many friends." Bayerl also failed to preserve counsel's testimony on this issue. In any event, such testimony was plainly admissible to rebut the defense suggestion that Dona had a habit of leaving after arguments and may have left of her own accord. *See* WIS. STAT. § 904.04(1)(b) (permitting "evidence of a pertinent trait of character of the victim … by the prosecution to rebut" character evidence of the victim offered by the accused).

¶41    In any event, we cannot conclude Bayerl was prejudiced under *Strickland* by the admission of this testimony. Bayerl had made similar statements to police, and those statements were used by the defense team during closing arguments to portray Bayerl as a caring husband who was concerned about his wife's well-being.

### G. Manner of Arrest and Custodial Silence

¶42    Next, Bayerl argues he was denied constitutionally adequate representation by his counsel's failure to object to testimony that a tactical unit apprehended him in Florida, as well as what he contends was impermissible commentary on his custodial silence during a post-arrest interview. Again, the State observes that Bayerl failed to preserve his trial counsel's testimony on this issue.

¶43     In any event, we conclude Bayerl has failed to demonstrate the testimony was constitutionally prejudicial.    The testimony about Bayerl's demeanor and response upon being told of his arrest was limited to the arresting officer's observation that Bayerl had a "neutral affect" when confronted and did not ask what he was being arrested for.  This evidence, considered in light of the totality of the evidence admitted, had an "isolated, trivial effect," particularly because the arresting officer had extensively discussed the case with Bayerl just months prior to his arrest.  *See Strickland*, 466 U.S. at 696.

*III.  New Trial In the Interest of Justice*

¶44     Bayerl argues he is entitled to a new trial in the interest of justice pursuant to WIS. STAT. § 752.35.[9]  "Discretionary reversal may be warranted if the court 'had before it testimony or evidence which had been improperly admitted, and this material obscured a crucial issue and prevented the real controversy from being fully tried.'"  *State v. Klapps*, 2021 WI App 5, ¶34, 395 Wis. 2d 743, 954 N.W.2d 38 (citation omitted).  Bayerl argues the real controversy was not fully tried because the "blood" evidence was improperly admitted and because the jury was not given an opportunity to hear expert rebuttal testimony.

¶45     We exercise our power of discretionary reversal sparingly and only in exceptional cases.  *State v. Schutte*, 2006 WI App 135, ¶62, 295 Wis. 2d 256, 720 N.W.2d 469.  As set forth above, Bayerl has not demonstrated that the circuit court's decision to admit the expert testimony regarding blood testing was erroneous, nor has he demonstrated that his attorney was constitutionally

---

[9] Bayerl also cites WIS. STAT. § 805.15(1) in support of his interest-of-justice argument. That statute, however, appears directed to circuit court proceedings.

ineffective for failing to call his expert at trial. The State's circumstantial case was sufficient to allow the jury to fairly adjudicate whether Dona was deceased and whether Bayerl was the killer, which was the real controversy. We conclude this is not an exceptional case warranting the exercise of our discretionary reversal authority.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.